# DUKE POWER CO. *v.* CAROLINA ENVIRONMENTAL STUDY GROUP, INC., ET AL.

No. 77–262.   Argued March 20, 1978—Decided June 26, 1978*

---

*Together with No. 77–375, *United States Nuclear Regulatory Commission et al.* v. *Carolina Environmental Study Group, Inc., et al.,* also on appeal from the same court.

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEWART, J., filed an opinion concurring in the result, *post,* p. 94. REHNQUIST, J., filed an opinion concurring in the judgment, in which STEVENS, J., joined, *post,* p. 95. STEVENS, J., filed an opinion concurring in the judgment, *post,* p. 102.

*Steve C. Griffith, Jr.,* argued the cause for appellant in No. 77–262. With him on the briefs were *Joseph B. Knotts, Jr.,* and *William Larry Porter.* Solicitor General McCree argued the cause for appellants in No. 77–375. With him on the briefs were *Assistant Attorney General Babcock, Deputy Solicitor General Jones, Harriet S. Shapiro, Robert E. Kopp, Thomas G. Wilson, Jerome Nelson,* and *Stephen F. Eilperin.*

*William B. Schultz* argued the cause for appellees in both cases. With him on the brief were *Alan B. Morrison, George Daly, Norman B. Smith,* and *Jonathan R. Harkavy.*†

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

These appeals present the question of whether Congress may, consistent with the Constitution, impose a limitation on

---

†Briefs of *amici curiae* urging reversal were filed by *Philip B. Kurland* and *William F. Steigman* for the American Hospital Assn. et al.; by *Northcutt Ely, Frederick H. Ritts,* and *Robert F. Pietrowski, Jr.,* for the American Public Power Assn.; by *Sutton Keany* for the Association of the Bar of the City of New York; by *Arthur W. Murphy* and *Harvey S. Price* for the Atomic Industrial Forum, Inc.; by *Harry A. Rissetto, O. S. Hiestand,* and *Alvin G. Kalmanson* for Babcock and Wilcox Co.; by *Raymond L. Falls, Jr.,* and *Michael P. Tierney* for Combustion Engineering, Inc.; by *Cameron F. MacRae, Leonard M. Trosten, Harry H. Voigt,* and *Eugene R. Fidell* for the Edison Electric Institute; by *William C. Wise* and *Robert Weinberg* for the National Rural Electric Cooperative Assn. et al.; by *Richard A. Whiting* and *William C. Kelly, Jr.,* for the Nuclear Energy Liability Property Insurance Assn. et al.; by *Ronald Zumbrun, John H. Findley, Albert Ferri, Jr.,* and *Donald C. Simpson* for the Pacific Legal Foundation; and by *Ben B. Blackburn* and *Wayne T. Elliott* for the Southeastern Legal Foundation.

*William J. Brown,* Attorney General, and *E. Dennis Murchnicki,* Assistant Attorney General, filed a brief for the State of Ohio as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Bronson C. La Follette,* Attorney General of Wisconsin, and *Patrick Walsh,* Assistant Attorney General, *Eldon G. Kaul,* Assistant Attorney General of Minnesota, and *Carl Valore, Jr.,* for the State of Wisconsin et al.; and by *Herbert H. Brown, Gilbert*

liability for nuclear accidents resulting from the operation of private nuclear power plants licensed by the Federal Government.

# I

# A

When Congress passed the Atomic Energy Act of 1946, it contemplated that the development of nuclear power would be a Government monopoly.  See Act of Aug. 1, 1946, ch. 724, 60 Stat. 755.  Within a decade, however, Congress concluded that the national interest would be best served if the Government encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing.  See H. R. Rep. No. 2181, 83d Cong., 2d Sess., 1–11 (1954).  The Atomic Energy Act of 1954, Act of Aug. 30, 1954, ch. 1073, 68 Stat. 919, as amended, 42 U. S. C. §§ 2011–2281 (1970 ed. and Supp. V), implemented this policy decision, providing for licensing of private construction, ownership, and operation of commercial nuclear power reactors for energy production under strict supervision by the Atomic Energy Commission (AEC).[1]  See *Power Reactor Development Co.* v. *Electrical Workers,* 367 U. S. 396 (1961), rev'g and remanding 108 U. S. App. D. C. 97, 280 F. 2d 645 (1960).

Private industry responded to the Atomic Energy Act of 1954 with the development of an experimental power plant constructed under the auspices of a consortium of interested companies.  It soon became apparent that profits from the private exploitation of atomic energy were uncertain and the accompanying risks substantial.  See Green, Nuclear Power:

---

*C. Miller,* and *Lawrence Coe Lanpher* for the Resources Agency, State of California.

[1] Under the terms of the Energy Reorganization Act of 1974, 42 U. S. C. § 5801 *et seq.* (1970 ed., Supp. V), the Nuclear Regulatory Commission (NRC) has now replaced the AEC as the licensing and regulatory authority.

Risk, Liability, and Indemnity, 71 Mich. L. Rev. 479–481 (1973) (Green). Although the AEC offered incentives to encourage investment, there remained in the path of the private nuclear power industry various problems—the risk of potentially vast liability in the event of a nuclear accident of a sizable magnitude being the major obstacle. Notwithstanding comprehensive testing and study, the uniqueness of this form of energy production made it impossible totally to rule out the risk of a major nuclear accident resulting in extensive damage. Private industry and the AEC were confident that such a disaster would not occur, but the very uniqueness of nuclear power meant that the possibility remained, and the potential liability dwarfed the ability of the industry and private insurance companies to absorb the risk. See Hearings before the Joint Committee on Atomic Energy on Government Indemnity for Private Licensees and AEC Contractors Against Reactor Hazards, 84th Cong., 2d Sess., 122–124 (1956). Thus, while repeatedly stressing that the risk of a major nuclear accident was extremely remote, spokesmen for the private sector informed Congress that they would be forced to withdraw from the field if their liability were not limited by appropriate legislation. *Id.*, at 9, 109–110, 115, 120, 136–137, 148, 181, 195, and 240.

Congress responded in 1957 by passing the Price-Anderson Act, 71 Stat. 576, 42 U. S. C. § 2210 (1970 ed. and Supp. V). The Act had the dual purpose of "protect[ing] the public and . . . encourag[ing] the development of the atomic energy industry." 42 U. S. C. § 2012 (i). In its original form, the Act limited the aggregate liability for a single nuclear incident [2] to $500 million plus the amount of liability insurance

---

[2] A "nuclear incident" is defined as "any occurrence . . . within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or by-product material . . . ." 42 U. S. C. § 2014 (q).

available on the private market—some $60 million in 1957. The nuclear industry was required to purchase the maximum available amount of privately underwritten public liability insurance, and the Act provided that if damages from a nuclear disaster exceeded the amount of that private insurance coverage, the Federal Government would indemnify the licensee and other "persons indemnified" [3] in an amount not to exceed $500 million. Thus, the actual ceiling on liability was the amount of private insurance coverage plus the Government's indemnification obligation which totaled $560 million.

Since its enactment, the Act has been twice amended, the first occasion being on the eve of its expiration in 1966.[4] These amendments extended the basic liability-limitation provisions for another 10 years, and added a provision which had the effect of requiring those indemnified under the Act to waive all legal defenses in the event of a substantial nuclear accident.[5] This provision was based on a congressional concern that state tort law dealing with liability for nuclear incidents was generally unsettled and that some way of insuring a common standard of responsibility for all jurisdictions—strict liability—was needed. A waiver of defenses was thought to be the preferable approach since it entailed less

---

[3] "The term 'person indemnified' means (1) with respect to a nuclear incident occurring within the United States . . . the person with whom an indemnity agreement is executed and any other person who may be liable for public liability . . . ." 42 U. S. C. § 2014 (t).

[4] By the terms of the Act as originally passed, it was only applicable to licenses issued between August 30, 1954, and August 1, 1967. § 4, 71 Stat. 576, as amended, 42 U. S. C. § 2210 (c).

[5] The waiver provision is incorporated in the indemnity agreement. The defenses of negligence, contributory negligence, charitable or governmental immunity and assumption of risk all are waived in the event of an extraordinary nuclear occurrence, as are, to a limited degree, defenses based on certain short state statutes of limitations. 80 Stat. 891, 42 U. S. C. § 2210 (n)(1). See also 10 CFR §§ 140.81 to 140.85, 140.91 to 140.92 (1977).

interference with state tort law than would the enactment of a federal statute prescribing strict liability.[6]  See S. Rep. No. 1605, 89th Cong., 2d Sess., 6–10 (1966).

In 1975, Congress again extended the Act's coverage until 1987, and continued the $560 million limitation on liability. However a new provision was added requiring, in the event of a nuclear incident, each of the 60 or more reactor owners to contribute between $2 and $5 million toward the cost of compensating victims.[7]  42 U. S. C. § 2210 (b) (1970 ed., Supp. V).  Since the liability ceiling remained at the same level, the effect of the "deferred premium" provision was to reduce the Federal Government's contribution to the liability pool.[8]  In its amendments to the Act in 1975, Congress also explicitly provided that "in the event of a nuclear incident involving damages in excess of [the] amount of aggregate liability, the Congress will thoroughly review the particular incident and will take whatever action is deemed necessary and appropriate to protect the public from the consequences of a

---

[6] The Act was also amended in 1966 to provide for the transfer of all claims arising out of a nuclear incident to a single federal district court. 42 U. S. C. § 2210 (n) (2).  If the court finds that liability may exceed the liability limitation of the Act, immediate payments to injured parties are limited to 15% of the liability limitation until the court approves a plan of distribution to insure equitable treatment of all parties.  § 2210 (o) (1970 ed. and Supp. V).

[7] The NRC, which was empowered by the 1975 amendments to choose a figure in the $2–$5 million range, has set the assessment at $5 million. 42 Fed. Reg. 46 (1977).

[8] As the number of reactors increases, the $5 million deferred premium in itself will yield a fund exceeding the present liability ceiling.  For example, it is predicted that by 1985 there will be a maximum of 138 reactors operating, see Executive Office of the President, The National Energy Plan 71 (1977), which would produce $690 million in addition to whatever insurance is available from the private insurance market.  Under the Act, the liability ceiling automatically increases to a level equal to the amount of primary and secondary (deferred premium) insurance coverage when the amount of such coverage exceeds the $560 million figure. 42 U. S. C. § 2210 (e) (1970 ed., Supp. V).

disaster of such magnitude . . . ." 42 U. S. C. § 2210 (e) (1970 ed., Supp. V).

Under the Price-Anderson Act as it presently stands, liability in the event of a nuclear incident causing damages of $560 million or more would be spread as follows: $315 million would be paid from contributions by the licensees of the 63 private operating nuclear power plants; $140 million would come from private insurance (the maximum now available); the remainder of $105 million would be borne by the Federal Government.[9]

### B

Appellant in No. 77–262, Duke Power Co., is an investor-owned public utility which is constructing one nuclear power plant in North Carolina and one in South Carolina. Duke Power, along with the NRC, was sued by appellees, two organizations—Carolina Environmental Study Group and the Catawba Central Labor Union—and 40 individuals who live within close proximity to the planned facilities. The action was commenced in 1973, and sought, among other relief, a declaration that the Price-Anderson Act is unconstitutional.[10]

After the parties had engaged in extensive discovery, the District Court held an evidentiary hearing on the questions of whether the issues were ripe for adjudication and whether

---

[9] Appellees' expert witness on insurance testified in the District Court that homeowners were unable to purchase insurance against nuclear catastrophes because "the nuclear industry has essentially absorbed the entire capacity of the private insurance markets in their need for property and liability insurance." App. 293–294.

[10] The complaint also sought review of the AEC's decision to grant a construction permit for one of the plants. During the pendency of this action, however, the United States Court of Appeals for the District of Columbia Circuit decided that the AEC had properly issued the permits. *Carolina Environmental Study Group* v. *United States,* 166 U. S. App. D. C. 416, 510 F. 2d 796 (1975). Accordingly, the District Court dismissed all counts of the complaint except those relating to the Price-Anderson Act's constitutionality.

appellees had standing to challenge the constitutionality of the Act. That court determined that appellees had standing and that their claim could properly be adjudicated. The District Court went on to hold that the Price-Anderson Act was unconstitutional in two respects: (a) it violated the Due Process Clause of the Fifth Amendment because it allowed injuries to occur without assuring adequate compensation to the victims; (b) the Act offended the equal protection component of the Fifth Amendment by forcing the victims of nuclear incidents to bear the burden of injury, whereas society as a whole benefits from the existence and development of nuclear power.

We noted probable jurisdiction [11] in these appeals, 434 U. S. 937 (1977), and we now reverse.

## II

As a threshold matter, we must address the question of whether the District Court had subject-matter jurisdiction over appellees' claims, despite the fact that none of the parties raised this issue and the District Court did not consider it. See *Liberty Mutual Ins. Co.* v. *Wetzel,* 424 U. S. 737, 740 (1976). Appellees' complaint alleges jurisdiction under 28 U. S. C. § 1337 (1976 ed.), which provides for original jurisdiction in the district courts over "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." Our reading of the pleadings,[12] however, indicates that

---

[11] Our jurisdiction was invoked under 28 U. S. C. § 1252 (1976 ed.), which provides for a direct appeal to this Court from any decision invalidating an Act of Congress in any suit to which the United States, its agencies, officers, or employees are parties.

[12] The complaint provides in relevant part:

"19. Since the Price-Anderson Act provides victims of a nuclear disaster no benefit while at the same time limiting their right to recover for their losses to approximately 2½% of such losses, the operation of the $500 million limitation would, in the event of a nuclear disaster, deprive the

appellees' claims do not "arise under" the Price-Anderson Act as that statutory language has been interpreted in prior decisions. See *Peyton* v. *Railway Express Agency,* 316 U. S. 350, 353 (1942).

Specifically, as we read the complaint, appellees are making two basic challenges to the Act—both of which find their moorings in the Fifth Amendment. First, appellees contend that the Due Process Clause protects them against arbitrary governmental action adversely affecting their property rights and that the Price-Anderson Act—which both creates the source of the underlying injury and limits the recovery therefor—constitutes such arbitrary action. And second, they are contending that in the event of a nuclear accident their property would be "taken" without any assurance of just compensation. The Price-Anderson Act is the instrument of the taking since on this record, without it, there would be no power plants and no possibility of an accident. Implicit in the complaint is also the assumption that there exists a cause of action directly under the Constitution to vindicate appellees' federal rights through a suit against the NRC, the executive agency charged with enforcement and administration of the allegedly unconstitutional statute.[13] Appellees' right to relief

_____

persons injured by such a disaster of property rights without due process of law in violation of the Fifth Amendment to the Constitution of the United States." App. 32.

[13] MR. JUSTICE REHNQUIST would read the complaint, insofar as it alleges a denial of due process, as stating a claim only against Duke Power under North Carolina law. Under such a construction of the complaint, the question of the constitutionality of the Price-Anderson Act would emerge only in anticipation of a defense to appellees' state-law claims and thus would not support federal jurisdiction under the "well-pleaded" complaint rule regardless of the jurisdictional statute relied upon. See *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149 (1908). We conclude that the complaint is more fairly read as stating a claim against the NRC directly under the Due Process Clause of the Fifth Amendment. See n. 12, *supra.* On this view, the "well-pleaded" complaint rule poses no bar to the assertion of jurisdiction. Appellees' claim under the Due Process Clause

thus depends not on the interpretation or construction of the Price-Anderson Act itself, but instead "upon the construction or application of the Constitution," *Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180, 199 (1921). Hence, if there exists jurisdiction to hear appellees' claims at all, it must be derived from 28 U. S. C. § 1331 (a) (1976 ed.), the general federal-question statute, rather than from § 1337—the jurisdictional base pleaded.[14]

For purposes of determining whether jurisdiction exists under § 1331 (a) to resolve appellees' claims, it is not necessary to decide whether appellees' alleged cause of action against the NRC based directly on the Constitution is in fact a cause of action "on which [appellees] could actually recover." *Bell* v. *Hood*, 327 U. S. 678, 682 (1946). Instead, the test is whether " 'the cause of action alleged is *so patently without merit* as to justify . . . the court's dismissal for want of jurisdiction.' " *Hagans* v. *Lavine*, 415 U. S. 528, 542–543 (1974), quoting *Bell* v. *Hood, supra*, at 683. (Emphasis added.) See also *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 666 (1974) (test is whether right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this

is an essential ingredient of a well-pleaded complaint asserting a right under the Constitution and is not simply a claim made in anticipation of a defense to be raised in an action having its origin in state law. See also n. 26, *infra*.

[14] Previously § 1331 (a) required a minimum amount in controversy in all suits, but a 1976 amendment eliminated the jurisdictional amount requirement in actions "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub. L. 94–574 § 2, 90 Stat. 2721. Thus this action, at least as against the NRC, would seem clearly permitted by § 1331 (a) without specification of an amount in controversy. See *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S. 604, 608 n. 6 (1978). Appellees' failure to assert § 1331 (a) as a basis for jurisdiction in their complaint is not fatal since the facts alleged are sufficient to support such jurisdiction. See 436 U. S., at 608 n. 6.

Court, or otherwise completely devoid of merit as not to involve a federal controversy"). In light of prior decisions, for example, *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971) and *Hagans* v. *Lavine, supra,* as well as the general admonition that "where federally protected rights have been invaded . . . courts will be alert to adjust their remedies so as to grant the necessary relief," *Bell* v. *Hood, supra,* at 684, we conclude that appellees' allegations are sufficient to sustain jurisdiction under § 1331 (a).[15]

The further question of whether appellees' cause of action under the Constitution is one generally to be recognized need not be decided here. The question does not directly implicate our jurisdiction, see *Bell* v. *Hood, supra,* was not raised in the court below, was not briefed, and was not addressed during oral argument. As we noted last Term in a similar context, questions of this sort should not be resolved on such an inadequate record; leaving them unresolved is no bar to full consideration of the merits. See *Mt. Healthy City Bd. of Educ.* v. *Doyle,* 429 U. S. 274, 278–279 (1977). It is enough for present purposes that the claimed cause of action to vindicate appel-

---

[15] MR. JUSTICE REHNQUIST suggests that appellees' "taking" claim will not support jurisdiction under § 1331 (a), but instead that such a claim can be adjudicated only in the Court of Claims under the Tucker Act, 28 U. S. C. § 1491 (1976 ed.). We disagree. Appellees are not seeking compensation for a taking, a claim properly brought in the Court of Claims, but are now requesting a declaratory judgment that since the Price-Anderson Act does not provide advance assurance of adequate compensation in the event of a taking, it is unconstitutional. As such, appellees' claim tracks quite closely that of the petitioners in the *Regional Rail Reorganization Act Cases,* 419 U. S. 102 (1974), which were brought under § 1331 as well as the Declaratory Judgment Act. See App. in *Regional Rail Reorganization Act Cases,* O. T. 1974, Nos. 74–165, 74–166, 74–167, 74–168, p. 161. While the Declaratory Judgment Act does not expand our jurisdiction, it expands the scope of available remedies. Here it allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.

lees' constitutional rights is sufficiently substantial and color-able to sustain jurisdiction under § 1331 (a).[16]

## III

The District Judge held four days of hearings on the questions of standing and ripeness; his factual findings form the basis for our analysis of these issues.

## A

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, *Warth* v. *Seldin,* 422 U. S. 490, 501 (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 261 (1977). See also *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 41–42 (1976); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973). Application of these constitutional standards to the factual findings of the District Court persuades us that the Art. III requisites for standing are satisfied by appellees.

We turn first to consider the kinds of injuries the District Court found the appellees suffered. It discerned two categories of effects which resulted from the operation of nuclear

[16] We need not resolve the question of whether Duke Power is a proper party since jurisdiction over appellees' claims against the NRC is established, and Duke's presence or absence makes no material difference to either our consideration of the merits of the controversy or our authority to award the requested relief.

power plants in potentially dangerous proximity to appellees' living and working environment. The immediate effects included: (a) the production of small quantities of non-natural radiation which would invade the air and water; (b) a "sharp increase" in the temperature of two lakes presently used for recreational purposes resulting from the use of the lake waters to produce steam and to cool the reactor; (c) interference with the normal use of the waters of the Catawba River; (d) threatened reduction in property values of land neighboring the power plants; (e) "objectively reasonable" present fear and apprehension regarding the "effect of the increased radioactivity in air, land and water upon [appellees] and their property, and the genetic effects upon their descendants"; and (f) the continual threat of "an accident resulting in uncontrolled release of large or even small quantities of radioactive material" with no assurance of adequate compensation for the resultant damage. 431 F. Supp. 203, 209. Into a second category of potential effects were placed the damages "which may result from a core melt or other major accident in the operation of a reactor . . . ." *Id.,* at 209.[17]

For purposes of the present inquiry, we need not determine whether all the putative injuries identified by the District Court, particularly those based on the possibility of a nuclear accident and the present apprehension generated by this future uncertainty, are sufficiently concrete to satisfy constitutional requirements. Compare *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), with *United States* v. *SCRAP,* 412 U. S. 669 (1973). See also *Conservation Society of Southern Vermont* v. *AEC,* Civ. Action No. 19–72 (DC Apr. 17, 1975). It is enough that several of the "immediate" adverse effects were found to harm appellees. Certainly the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type

---

[17] For a detailed explanation of the nature and consequences of a core melt, see 431 F. Supp., at 206–207.

of harmful effect which has been deemed adequate in prior cases to satisfy the "injury in fact" standard. See *United States* v. *SCRAP, supra.* Cf. *Sierra Club* v. *Morton,* 405 U. S. 727, 734 (1972).[18] And the emission of non-natural radiation into appellees' environment would also seem a direct and present injury, given our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions like those concededly emitted by nuclear power plants.[19]

The more difficult step in the standing inquiry is establishing that these injuries "fairly can be traced to the challenged action of the defendant," *Simon* v. *Eastern Ky. Welfare Rights Org., supra,* at 41, or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries. 426 U. S., at 43. The District Court discerned a "but for" causal connection between the Price-Anderson Act, which appellees challenged as unconstitutional, "and the construction of the nuclear plants which the [appellees] view as a threat to them." 431 F. Supp., at 219. Particularizing that causal link to the facts of the instant case, the District Court concluded that "there is a substantial likelihood that Duke would not be able to complete the construction and maintain the operation of the McGuire and Catawba Nuclear Plants

---

[18] "We do not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing . . . . Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society . . . ." *Sierra Club* v. *Morton,* 405 U. S., at 734.

[19] It is argued that the District Court's findings on the question of injury in fact upon which we rely are clearly erroneous and should not be accepted as a predicate for standing. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 395 (1948). Application of this standard to the factual findings of the District Court does not persuade us that they should not be accepted.

but for the protection provided by the Price-Anderson Act." *Id.*, at 220.

These findings, which, if accepted, would likely satisfy the second prong of the constitutional test for standing as elaborated in *Simon*,[20] are challenged on two grounds. First, it is argued that the evidence presented at the hearing, contrary to the conclusion reached by the District Court, indicated that the McGuire and Catawba nuclear plants would be completed and operated without the Price-Anderson Act's limitation on liability. And second, it is contended that the Price-Anderson Act is not, in some essential sense, the "but for" cause of the disputed nuclear power plants and resultant adverse effects since if the Act had not been passed Congress may well have chosen to pursue the nuclear program as a Government monopoly as it had from 1946 until 1954. We reject both of these arguments.

The District Court's finding of a "substantial likelihood" that the McGuire and Catawba nuclear plants would be neither completed nor operated absent the Price-Anderson Act rested in major part on the testimony of corporate officials before the Joint Committee on Atomic Energy (JCAE) in 1956–1957 when the Price-Anderson Act was first considered and again in 1975 when a second renewal was discussed. During the 1956–1957 hearings, industry spokesmen for the utilities and the producers of the various component parts of the power plants expressed a categorical unwillingness to participate in the development of nuclear power absent guarantees of a limitation on their liability. 431 F. Supp., at 215. See also

---

[20] Our recent cases have required no more than a showing that there is a "substantial likelihood" that the relief requested will redress the injury claimed to satisfy the second prong of the constitutional standing requirement. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 262 (1977), quoting *Simon* v. *Eastern Ky. Welfare Rights Org.*, 426 U. S. 26, 38 (1976) ("MHDC has shown an injury to itself that is 'likely to be redressed by a favorable decision'"). See also *Warth* v. *Seldin*, 422 U. S. 490, 504, 506–507 (1975).

Green 486, 490–491.[21] By 1975, the tenor of the testimony had changed only slightly. While large utilities and producers were somewhat more equivocal about whether a failure to renew Price-Anderson would entail their leaving the industry, the smaller producers of component parts and architects and engineers—all of whom are essential to the building of the reactors and generating plants—considered renewal of the Act as the critical variable in determining their continued involvement with nuclear power. 431 F. Supp., at 216–217. Duke Power itself, in its letter to the Committee urging extension of the Act, cited recent experiences with suppliers and contractors who were requiring the inclusion of cancellation clauses in their contracts to take effect if the liability-limitation provisions were eliminated. *Id.*, at 217. And the Report of the JCAE, in discussing the need for renewal of the Act, stated:

> "Nuclear power plants now in the planning and design phases would not receive construction permits until about 1977–1978. Thus there is uncertainty as to whether these plants would receive protection in the form of Government indemnity. Reactor manufacturers and architect-engineers are already requiring escape clauses in their contracts to permit cancellation in the event some form of protection from unlimited potential liability is not provided. Action is required soon to prevent disruption in utility plans for nuclear power." H. R. Rep. No. 94–648, p. 7 (1975).

Nor was the testimony at the hearing in this case, evaluation of which is the primary responsibility of the trial judge, at odds with the impression drawn from the legislative history. The testimony of Executive Vice President Lee of Duke Power

---

[21] Nor was the situation different in 1965–1966, when the first 10-year renewal of Price-Anderson was considered. See H. R. Rep. No. 883, 89th Cong., 1st Sess., 9 (1965). See generally Green 493.

simply echoed the views presented by Duke and others to Congress in 1975, that is, although some of the utilities themselves might be confident enough with respect to safety factors to proceed with nuclear power absent a liability limitation, the suppliers of critical parts and the utility shareholders could reasonably be expected to take a more cautious view.[22] Appellees presented expert testimony essentially to the same effect. Considering the documentary evidence and the testimony in the record, we cannot say we are left with "the definite and firm conviction that" the finding by the trial court of a substantial likelihood that the McGuire and Catawba nuclear power plants would be neither completed nor operated absent the Price-Anderson Act is clearly erroneous; and, hence, we are bound to accept it. *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948).

The second attack on the District Court's finding of a causal link warrants only brief attention. Essentially the argument is, as we understand it, that Price-Anderson is not a "but for" cause of the injuries appellees claim since, if Price-Anderson had not been passed, the Government would have undertaken development of nuclear power on its own and the same injuries would likely have accrued to appellees from such Government-operated plants as from privately operated ones. Whatever the ultimate accuracy of this speculation, it is not responsive to the simple proposition that private power companies now do in fact operate the nuclear-powered generating plants in-

---

[22] "From what I know about nuclear power, it would be my recommendation that Duke proceed even in the absence of Price-Anderson. However, from the point of view of how others perceive nuclear power, there is some question about whether it would be a practical undertaking in the absence of the Act. . . . I have already been advised by several firms that the existence of Price-Anderson is required for them to be a supplier to our nuclear program . . . . If Price-Anderson did not exist, I would therefore have to evaluate the extent to which its absence caused disappearance of suppliers from the marketplace in arriving at my recommendation." App. 368–369.

juring appellees, and that their participation would not have occurred but for the enactment and implementation of the Price-Anderson Act. Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.

## B

It is further contended that in addition to proof of injury and of a causal link between such injury and the challenged conduct, appellees must demonstrate a connection between the injuries they claim and the constitutional rights being asserted. This nexus requirement is said to find its origin in *Flast* v. *Cohen,* 392 U. S. 83 (1968), where the general question of taxpayer standing was considered:

> "The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Id.,* at 102.

See also *United States* v. *Richardson,* 418 U. S. 166, 174–175 (1974). Since the environmental and health injuries claimed by appellees are not directly related to the constitutional attack on the Price-Anderson Act, such injuries, the argument continues, cannot supply a predicate for standing.[23] We decline to accept this argument.

The major difficulty with the argument is that it implicitly assumes that the nexus requirement formulated in the context of taxpayer suits has general applicability in suits of all other types brought in the federal courts. No cases have been cited

---

[23] The only injury that would possess the required subject-matter nexus to the due process challenge is the injury that would result from a nuclear accident causing damages in excess of the liability limitation provisions of the Price-Anderson Act.

outside the context of taxpayer suits where we have demanded this type of subject-matter nexus between the right asserted and the injury alleged, and we are aware of none.[24] Instead, in *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208, 225 n. 15 (1974), we explicitly rejected such a broad compass for the *Flast* nexus requirement:

> "Looking 'to the substantive issues' which *Flast* stated to be both 'appropriate and necessary' in relation to taxpayer standing was for the express purpose of determining 'whether there is a logical nexus between the [taxpayer] status asserted and the claim sought to be adjudicated.' 392 U. S., at 102. This step is not appropriate on a claim of citizen standing since the *Flast* nexus test is not applicable where the taxing and spending power is not challenged. . . ."

We continue to be of the same view and cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate something more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the "case or controversy" requirement of Art. III.[25]

---

[24] In *Linda R. S.* v. *Richard D.,* 410 U. S. 614 (1973), a nontaxpayer suit, reference was made to *Flast*'s nexus requirement in the course of denying appellant's standing to challenge the nonenforcement of Texas' desertion and nonsupport statute. Upon careful reading, however, it is clear that standing was denied not because of the absence of a subject-matter nexus between the injury asserted and the constitutional claim, but instead because of the unlikelihood that the relief requested would redress appellant's claimed injury. *Id.,* at 618. This case thus provides no qualitative support for the broader application of *Flast*'s principles which appellants appear to advocate. Cf. Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L. Rev. 645, 660–662 (1973).

[25] Both at the time of its formulation, see *Flast* v. *Cohen,* 392 U. S., at 120, 130–131 (Harlan J., dissenting), and more recently, see *United States* v. *Richardson,* 418 U. S. 166, 181, 196 n. 18 (1974) (POWELL, J., concurring), there have been questions as to whether the nexus require-

Our prior cases have, however, acknowledged "other limits on the class of persons who may invoke the courts' decisional and remedial powers," *Warth* v. *Seldin,* 422 U. S., at 499, which derive from general prudential concerns "about the proper—and properly limited—role of the courts in a democratic society." *Id.,* at 498. See also *Schlesinger* v. *Reservists Comm. to Stop the War, supra,* at 221–227. Thus, we have declined to grant standing where the harm asserted amounts only to a generalized grievance shared by a large number of citizens in a substantially equal measure. See *United States* v. *Richardson, supra.* We have also narrowly limited the circumstances in which one party will be given standing to assert the legal rights of another. "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin, supra,* at 499. See also *United States* v. *Raines,* 362 U. S. 17 (1960). This limitation on third-party standing arguably suggests a connection between the claimed injury and the right asserted bearing some resemblance to the nexus requirement now urged upon us.

There are good and sufficient reasons for this prudential limitation on standing when rights of third parties are implicated—the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them. See *Singleton* v. *Wulff,* 428 U. S. 106, 113–114 (1976). We do not, however, find these reasons a satisfactory predicate for applying this limitation or a similar nexus requirement to all cases as a matter of course. Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be

ment, even in the context of taxpayers' suits, is constitutionally mandated or is instead simply a prudential limitation.

prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met. See, e. g., *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977).

We conclude that appellees have standing to challenge the constitutionality of the Price-Anderson Act.[26]

## C

The question of the ripeness of the constitutional challenges raised by appellees need not long detain us. To the extent that "issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,'" *Regional Rail Reorganization Act Cases*, 419 U. S., at 138, our conclusion that appellees will sustain immediate injury from the operation of the disputed power plants and that such injury would be redressed by the relief requested would appear to satisfy this requirement.

The prudential considerations embodied in the ripeness doctrine also argue strongly for a prompt resolution of the claims presented. Although it is true that no nuclear accident has yet occurred and that such an occurrence would eliminate much of the existing scientific uncertainty surrounding this

---

[26] MR. JUSTICE REHNQUIST undertakes to sever the action of the NRC in executing indemnity agreements under the Act from the Act's alleged constitutional infirmities—particularly the liability limitation provisions. Careful examination of the statutory mechanism indicates that such a separation simply cannot be sustained. The execution of the indemnification agreements by the NRC triggers the statutory ceiling on liability which, in terms, applies only to "persons indemnified." See 42 U. S. C. § 2210 (e) (1970 ed., Supp. V). Thus, absent the execution of such agreements between the NRC and the licensees, the liability-limitation provisions of the Act, to which appellees object, would simply not come into play. This fact, coupled with the District Court's finding that "but for" the liability-limitation provisions there is a substantial likelihood that the contemplated plants would not be built or operated, is sufficient to establish the justiciability of appellees' claim against the Commission. See *Simon* v. *Eastern Ky. Welfare Rights Org.*, 426 U. S., at 44–46.

subject, it would not, in our view, significantly advance our ability to deal with the legal issues presented nor aid us in their resolution. However, delayed resolution of these issues would foreclose any relief from the present injury suffered by appellees—relief that would be forthcoming if they were to prevail in their various challenges to the Act. Similarly, delayed resolution would frustrate one of the key purposes of the Price-Anderson Act—the elimination of doubts concerning the scope of private liability in the event of major nuclear accident. In short, all parties would be adversely affected by a decision to defer definitive resolution of the constitutional validity *vel non* of the Price-Anderson Act. Since we are persuaded that "we will be in no better position later than we are now" to decide this question, *Id.*, at 143–145, we hold that it is presently ripe for adjudication.

## IV

The District Court held that the Price-Anderson Act contravened the Due Process Clause because "[t]he amount of recovery is not rationally related to the potential losses"; because "[t]he Act tends to encourage irresponsibility in matters of safety and environmental protection . . ."; and finally because "[t]here is no *quid pro quo*" for the liability limitations. 431 F. Supp., at 222–223. An equal protection violation was also found because the Act "places the cost of [nuclear power] on an arbitrarily chosen segment of society, those injured by nuclear catastrophe." *Id.*, at 225. Application of the relevant constitutional principles forces the conclusion that these holdings of the District Court cannot be sustained.

## A

Our due process analysis properly begins with a discussion of the appropriate standard of review. Appellants, portraying the liability-limitation provision as a legislative balancing of economic interests, urge that the Price-Anderson Act be

accorded the traditional presumption of constitutionality generally accorded economic regulations and that it be upheld absent proof of arbitrariness or irrationality on the part of Congress. See *Ferguson* v. *Skrupa*, 372 U. S. 726, 731–732 (1963); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976). Appellees, however, urge a more elevated standard of review on the ground that the interests jeopardized by the Price-Anderson Act "are far more important than those in the economic due process and business-oriented cases" where the traditional rationality standard has been invoked. Brief for Appellees 36. An intermediate standard like that applied in cases such as *Craig* v. *Boren*, 429 U. S. 190 (1976) (equal protection challenge to statute requiring that males be older than females in order to purchase beer) or *United States Trust Co. of New York* v. *New Jersey*, 431 U. S. 1 (1977) (Contract Clause challenge to repeal of statutory covenant providing security for bondholders) is thus recommended for our use here.

As we read the Act and its legislative history, it is clear that Congress' purpose was to remove the economic impediments in order to stimulate the private development of electric energy by nuclear power while simultaneously providing the public compensation in the event of a catastrophic nuclear incident. See, *e. g.*, S. Rep. No. 296, 85th Cong., 1st Sess., 15 (1957). The liability-limitation provision thus emerges as a classic example of an economic regulation—a legislative effort to structure and accommodate "the burdens and benefits of economic life." *Usery* v. *Turner Elkhorn Mining Co., supra,* at 15. "It is by now well established that [such] legislative Acts . . . come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Ibid.* That the accommodation struck may have profound and far-reaching consequences, contrary to appellees' suggestion, provides all the

more reason for this Court to defer to the congressional judgment unless it is demonstrably arbitrary or irrational.[27]

## B

When examined in light of this standard of review, the Price-Anderson Act, in our view, passes constitutional muster. The record before us fully supports the need for the imposition of a statutory limit on liability to encourage private industry participation and hence bears a rational relationship to Congress' concern for stimulating the involvement of private enterprise in the production of electric energy through the use of atomic power; nor do we understand appellees or the District Court to be of a different view. Rather their challenge is to the alleged arbitrariness of the *particular figure* of $560 million, which is the statutory ceiling on liability. The District Court aptly summarized its position:

> "The amount of recovery is not rationally related to the potential losses. Abundant evidence in the record shows that although major catastrophe in any particular place is not certain and may not be extremely likely, nevertheless, in the territory where these plants are located, damage to life and property for this and future generations could well be many, many times the limit which the law places on liability." 431 F. Supp., at 222.

Assuming, *arguendo,* that the $560 million fund would not insure full recovery in all conceivable circumstances[28]—and

---

[27] Appellees, in apparent reliance on our recent decision in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), argue that because the Price-Anderson Act encroaches on substantial state government interests, an augmented standard of review under the Due Process Clause is warranted. Nothing in *National League of Cities* or in our prior due process cases provides any support for this claim.

[28] As the various studies considered by the District Court indicate, there is considerable uncertainty as to the amount of damages which would result from a catastrophic nuclear accident. See 431 F. Supp., at

the hard truth is that no one can ever know—it does not by any means follow that the liability limitation is therefore irrational and violative of due process. The legislative history clearly indicates that the $560 million figure was not arrived at on the supposition that it alone would necessarily be sufficient to guarantee full compensation in the event of a nuclear incident. Instead, it was conceived of as a "starting point" or a working hypothesis.[29] The reasonableness of the statute's assumed ceiling on liability was predicated on two corollary considerations—expert appraisals of the exceedingly small risk of a nuclear incident involving claims in excess of $560 million, and the recognition that in the event of such an incident, Congress would likely enact extraordinary relief provisions to provide additional relief, in accord with prior practice.

> "[T]his limitation does not, as a practical matter, detract
> from the public protection afforded by this legislation.
> In the first place, the likelihood of an accident occurring

210–214. The Reactor Safety Study published by the NRC in 1975 suggested that there was a 1 in 20,000 chance (per reactor year) of an accident causing property damage approaching $100 million and having only minor health effects. By contrast, when the odds were reduced to the range of 1 in 1 billion (per reactor year), the level of damages approached $14 billion; and 3,300 early fatalities and 45,000 early illnesses were predicted. NRC, Reactor Safety Study, An Assessment of Accident Risks in U. S. Commercial Nuclear Power Plants 83–85 (Wash-1400, Oct. 1975). For a thorough criticism of the Reactor Safety Study, see EPA, Reactor Safety Study (Wash-1400): A Review of the Final Report (June 1976).

[29] "What we were thinking about was the magnitude of protection and we set an arbitrary figure because it seemed to be practical at that time and because we didn't think an accident would happen . . . but yet we recognize that it could happen. *We wanted to have a base to work from.*" Hearings before the Joint Committee on Atomic Energy on Possible Modification or Extension of the Price-Anderson Insurance And Indemnity Act of 1957 In Order for Proper Planning of Nuclear Power Plants to Continue Without Delay, 93d Cong., 2d Sess., 68 (1974) (remarks of Rep. Holifield) (emphasis added).

which would result in claims exceeding the sum of the financial protection required and the governmental indemnity is exceedingly remote, albeit theoretically possible. Perhaps more important, in the event of a national disaster of this magnitude, it is obvious that Congress would have to review the problem and take appropriate action. The history of other natural or man-made disasters, such as the Texas City incident, bears this out. The limitation of liability serves primarily as a device for facilitating further congressional review of such a situation, rather than as an ultimate bar to further relief of the public." H. R. Rep. No. 883, 89th Cong., 1st Sess., 6–7 (1965).

See also S. Rep. No. 296, *supra*, at 21; H. R. Rep. No. 94–648, pp. 12, 15 (1975).

Given our conclusion that, in general, limiting liability is an acceptable method for Congress to utilize in encouraging the private development of electric energy by atomic power, candor requires acknowledgment that whatever ceiling figure is selected will, of necessity, be arbitrary in the sense that any choice of a figure based on imponderables like those at issue here can always be so characterized. This is not, however, the kind of arbitrariness which flaws otherwise constitutional action. When appraised in terms of both the extremely remote possibility of an accident where liability would exceed the limitation [30] and Congress' now statutory commitment to "take whatever action is deemed necessary and appropriate to protect the public from the consequences of" any such disaster, 42 U. S. C. § 2210 (e) (1970 ed., Supp. V),[31] we hold the

---

[30] Congress' conclusion that "the probabilities of a nuclear incident are much lower and the likely consequences much less severe than has been thought previously," was a key factor in the decision not to increase the $560 million liability ceiling in 1975. S. Rep. No. 94–454, p. 12 (1975).

[31] In the past Congress has provided emergency assistance for victims of catastrophic accidents even in the absence of a prior statutory commitment to do so. For example, in 1955, Congress passed the Texas City

congressional decision to fix a $560 million ceiling, at this stage in the private development and production of electric energy by nuclear power, to be within permissible limits and not violative of due process.

This District Court's further conclusion that the Price-Anderson Act "tends to encourage irresponsibility . . . on the part of builders and owners" of the nuclear power plants, 431 F. Supp., at 222, simply cannot withstand careful scrutiny. We recently outlined the multitude of detailed steps involved in the review of any application for a license to construct or to operate a nuclear power plant, *Vermont Yankee Nuclear Power Corp.* v. *NRDC,* 435 U. S. 519, 526–527, and n. 5 (1978); nothing in the liability-limitation provision undermines or alters in any respect the rigor and integrity of that process. Moreover, in the event of a nuclear accident the utility itself would suffer perhaps the largest damages. While obviously not to be compared with the loss of human life and injury to health, the risk of financial loss and possible bankruptcy to the utility is in itself no small incentive to avoid the kind of irresponsible and cavalier conduct implicitly attributed to licensees by the District Court.

The remaining due process objection to the liability-limitation provision is that it fails to provide those injured by a

_____

Explosion Relief Act, 69 Stat. 707, to provide relief for victims of the explosion of ammonium nitrate fertilizer in 1947. Congress took this action despite the decision in *Dalehite* v. *United States,* 346 U. S. 15 (1953), holding the United States free from any liability under the Federal Tort Claims Act for the damages incurred and injuries suffered. More recently Congress enacted legislation to provide relief for victims of the flood resulting from the collapse of the Teton Dam in Idaho. Pub. L. 94–400, 90 Stat. 1211. Under the Act, the Secretary of the Interior was authorized to provide full compensation for any deaths, personal injuries, or property damage caused by the failure of the dam. *Ibid.*

The Price-Anderson Act is, of course, a significant improvement on these prior relief efforts because it provides an advance guarantee of recovery up to $560 million plus an express commitment by Congress to take whatever further steps are necessary to aid the victims of a nuclear incident.

nuclear accident with a satisfactory *quid pro quo* for the common-law rights of recovery which the Act abrogates. Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy.[32]  However, we need not resolve this question here since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common-law or state tort law remedies it replaces.  Cf. *New York Central R. Co.* v. *White,* 243 U. S. 188 (1917); *Crowell* v. *Benson,* 285 U. S. 22 (1932).[33]

---

[32] Our cases have clearly established that "[a] person has no property, no vested interest, in any rule of the common law." *Second Employers' Liability Cases,* 223 U. S. 1, 50 (1912), quoting *Munn* v. *Illinois,* 94 U. S. 113, 134 (1877).  The "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," *Silver* v. *Silver,* 280 U. S. 117, 122 (1929), despite the fact that "otherwise settled expectations" may be upset thereby.  *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 16 (1976).  See also *Arizona Employers' Liability Cases,* 250 U. S. 400, 419–422 (1919).  Indeed, statutes limiting liability are relatively commonplace and have consistently been enforced by the courts. See, *e. g., Silver* v. *Silver, supra* (automobile guest statute); *Providence & New York S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578 (1883) (limitation of vessel owner's liability); *Indemnity Ins. Co. of North America* v. *Pan American Airways,* 58 F. Supp. 338 (SDNY 1944) (Warsaw Convention limitation on recovery for injuries suffered during international air travel).  Cf. *Thomason* v. *Sanchez,* 539 F. 2d 955 (CA3 1976) (Federal Driver's Act).

[33] We reject at the outset appellees' contention that the Price-Anderson Act differs from other statutes limiting liability because the Act itself is the "but for" cause of the tort for which liability is limited.  Put otherwise, the argument is that no *quid pro quo* can be provided by the Act since without it there would be no nuclear power plants and no possibility of accidents or injuries.  As we understand the argument, it proceeds from the premise that prior to the enactment of the Price-Anderson Act, appellees had some right, cognizable under the Due Process Clause, to be free of nuclear power or to take advantage of the state of uncertainty which inhibited the private development of nuclear power.  This premise we cannot accept.  Appellees' only relevant right prior to the enactment

The legislative history of the liability-limitation provisions and the accompanying compensation mechanism reflects Congress' determination that reliance on state tort law remedies and state-court procedures was an unsatisfactory approach to assuring public compensation for nuclear accidents, while at the same time providing the necessary incentives for private development of nuclear-produced energy. The remarks of Chairman Anders of the NRC before the Joint Committee on Atomic Energy during the 1975 hearings on the need for renewal of the Price-Anderson Act are illustrative of this concern and of the expectation that the Act would provide a more efficient and certain vehicle for assuring compensation in the unlikely event of a nuclear incident:

"The primary defect of this alternative [nonrenewal of the Act], however, is its failure to afford the public either a secure source of funds or a firm basis for legal liability with respect to new plants. While in theory no legal limit would be placed on liability, as a practical matter the public would be less assured of obtaining compensation than under Price-Anderson. Establishing liability would depend in each case on state tort law and procedures, and these might or might not provide for no-fault liability, let alone the multiple other protections now embodied in Price-Anderson. The present assurance of prompt and equitable compensation under a pre-structured and nationally applicable protective system would give way to uncertainties, variations and potentially lengthy delays in recovery. It should be emphasized, moreover, that it is collecting a judgment, not filing a

_____

of the Price-Anderson Act was to utilize their existing common-law and state-law remedies to vindicate any particular harm visited on them from whatever sources. After the Act was passed, that right at least with regard to nuclear accidents was replaced by the compensation mechanism of the statute, and it is only the terms of that substitution which are pertinent to the *quid pro quo* inquiry which appellees insist the Due Process Clause requires.

lawsuit, that counts. Even if defenses are waived under state law, a defendant with theoretically "unlimited" liability may be unable to pay a judgment once obtained. When the defendant's assets are exhausted by earlier judgments, subsequent claimants would be left with uncollectable awards. The prospect of inequitable distribution would produce a race to the courthouse door in contrast to the present system of assured orderly and equitable compensation." Hearings on H. R. 8631 before Joint Committee on Atomic Energy, 94th Cong., 1st Sess., 69 (1975).

Appellees, like the District Court, differ with this appraisal on several grounds. They argue, *inter alia,* that recovery under the Act would not be greater than without it, that the waiver of defenses required by the Act, 42 U. S. C. § 2210 (n) (1970 ed., Supp. V), is an idle gesture since those involved in the development of nuclear energy would likely be held strictly liable under common-law principles; [34] that the claim-administration procedure under the Act delays rather than expedites individual recovery; and finally that recovery of even limited compensation is uncertain since the liability ceiling does not vary with the number of persons injured or amount of property damaged. The extension of short state statutes of limitations and the provision of omnibus [35] coverage do not save the Act, in their view, since such provisions could equally well be included in a fairer plan which would assure greater compensation.

We disagree. We view the congressional *assurance* of a $560 million fund for recovery, accompanied by an express statutory commitment, to "take whatever action is deemed necessary

---

[34] See *Rylands* v. *Fletcher*, L. R. 3 E. & I. App. 330 (H. L. 1868). See generally W. Prosser, Law of Torts § 79, p. 516 (4th ed. 1971); Cavers, Improving Financial Protection of the Public Against the Hazards of Nuclear Power, 77 Harv. L. Rev. 644, 649 (1964).

[35] See n. 3, *supra.*

and appropriate to protect the public from the consequences of" a nuclear accident, 42 U. S. C. § 2210 (e) (1970 ed., Supp. V), to be a fair and reasonable substitute for the uncertain recovery of damages of this magnitude from a utility or component manufacturer, whose resources might well be exhausted at an early stage. The record in this case raises serious questions about the ability of a utility or component manufacturer to satisfy a judgment approaching $560 million—the amount guaranteed under the Price-Anderson Act.[36] Nor are we persuaded that the mandatory waiver of defenses required by the Act is of no benefit to potential claimants. Since there has never been, to our knowledge, a case arising out of a nuclear incident like those covered by the Price-Anderson Act, any discussion of the standard of liability that state courts will apply is necessarily speculative. At the minimum, the statutorily mandated waiver of defenses establishes at the threshold the right of injured parties to compensation without proof of fault and eliminates the burden of delay and uncertainty which would follow from the need to litigate the question of liability after an accident. Further, even if strict liability were routinely applied, the common-law doctrine is subject to exceptions for acts of God or of third parties[37]—two of the very factors which appellees emphasized in the District Court in

---

[36] The expert testimony before the District Court indicated that Duke Power, one of the largest utilities in the country, could not be expected to accumulate more than $200 million for damages claims without reaching the point of insolvency. App. 393–397. This amount, even when coupled with the amount of available private insurance, would be less than the $560 million provided by the Act. Moreover, if the liability were of sufficient magnitude to force the utility or component manufacturer into bankruptcy or reorganization, recovery would likely be further reduced and delayed. See Joint Committee on Atomic Energy, Issues of Financial Protection in Nuclear Activities in Selected Materials on Atomic Energy Indemnity and Insurance Legislation, 93d Cong., 2d Sess., 110 (Comm. Print 1974).

[37] See Prosser, *supra*, n. 34, at 520–521.

the course of arguing that the risks of a nuclear accident are greater than generally admitted. All of these considerations belie the suggestion that the Act leaves the potential victims of a nuclear disaster in a more disadvantageous position than they would be in if left to their common-law remedies—not known in modern times for either their speed or economy.

Appellees' remaining objections can be briefly treated. The claim-administration procedures under the Act provide that in the event of an accident with potential liability exceeding the $560 million ceiling, no more than 15% of the limit can be distributed pending court approval of a plan of distribution taking into account the need to assure compensation for "possible latent injury claims which may not be discovered until a later time." 42 U. S. C. § 2210 (o)(3) (1970 ed., Supp. V). Although some delay might follow from compliance with this statutory procedure, we doubt that it would approach that resulting from routine litigation of the large number of claims caused by a catastrophic accident.[38] Moreover, the statutory scheme insures the equitable distribution of benefits to all who suffer injury—both immediate and latent; under the common-law route, the proverbial race to the courthouse would instead determine who had "first crack" at the diminishing resources of the tortfeasor, and fairness could well be sacrificed in the process. The remaining contention that recovery is uncertain because of the aggregate rather than individualized nature of the liability ceiling is but a thinly disguised version of the contention that the $560 million figure is inadequate, which we have already rejected.

In the course of adjudicating a similar challenge to the

---

[38] The Act explicitly provides for "payments to, or for the aid of, claimants for the purpose of providing immediate assistance following a nuclear incident." 42 U. S. C. § 2210 (m). Unlike the normal tort recovery situation, these emergency payments are made prior to the determination of injury and the setting of damages, and are not conditioned on the execution of any release by the victim. *Ibid.*

Workmen's Compensation Act in *New York Central R. Co.* v. *White*, 243 U. S., at 201, the Court observed that the Due Process Clause of the Fourteenth Amendment was not violated simply because an injured party would not be able to recover as much under the Act as before its enactment. "[H]e is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty and expense of establishing negligence or proving the amount of the damages." The logic of *New York Central* would seem to apply with renewed force in the context of this challenge to the Price-Anderson Act. The Price-Anderson Act not only provides a reasonable, prompt, and equitable mechanism for compensating victims of a catastrophic nuclear incident, it also guarantees a level of net compensation generally exceeding that recoverable in private litigation. Moreover, the Act contains an explicit congressional commitment to take further action to aid victims of a nuclear accident in the event that the $560 million ceiling on liability is exceeded. This panoply of remedies and guarantees is at the least a reasonably just substitute for the common-law rights replaced by the Price-Anderson Act. Nothing more is required by the Due Process Clause.

Although the District Court also found the Price-Anderson Act to contravene the "equal protection provision that is included within the Due Process Clause of the Fifth Amendment," 431 F. Supp., at 224–225, appellees have not relied on this ground since the equal protection arguments largely track and duplicate those made in support of the due process claim. In any event, we conclude that there is no equal protection violation. The general rationality of the Price-Anderson Act liability limitations—particularly with reference to the important congressional purpose of encouraging private participation in the exploitation of nuclear energy—is ample justification for the difference in treatment between those injured in nuclear accidents and those whose injuries are derived from other

causes. Speculation regarding other arrangements that might be used to spread the risk of liability in ways different from the Price-Anderson Act is, of course, not pertinent to the equal protection analysis. See *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 378 (1973).[39]

Accordingly, the decision of the District Court is reversed, and the cases are remanded for proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring in the result.

With some difficulty I can accept the proposition that federal subject-matter jurisdiction under 28 U. S. C. § 1331 (1976 ed.) exists here, at least with respect to the suit against the Nuclear Regulatory Commission, the agency responsible for the administration of the Price-Anderson Act. The claim under federal law is to be found in the allegation that the Act, if enforced, will deprive the appellees of certain property rights, in violation of the Due Process Clause of the Fifth Amendment. One of those property rights, and perhaps the sole cognizable one, is a state-created right to recover full compensation for tort injuries. The Act impinges on that right by limiting recovery in major accidents.

---

[39] Appellees also contend that the Price-Anderson Act effects an unconstitutional "taking" because in the event of a catastrophic nuclear accident their property would be destroyed without any assurance of just compensation. We find it unnecessary to resolve the claim that such an accident would constitute a "taking" as that term has been construed in our precedents since on our reading the Price-Anderson Act does not withdraw the existing Tucker Act remedy, 28 U. S. C. § 1491 (1976 ed.). See *Regional Rail Reorganization Act Cases,* 419 U. S., at 125–136. Appellees concede that if the Tucker Act remedy would be available in the event of a nuclear disaster, then their constitutional challenge to the Price-Anderson Act under the Just Compensation Clause must fail. Brief for Appellees 71 n. 56. The further question of whether a taking claim could be established under the Fifth Amendment is a matter appropriately left for another day.

But there never has been such an accident, and it is sheer speculation that one will ever occur. For this reason I think there is no present justiciable controversy, and that the appellees were without standing to initiate this litigation.

On the issue of standing, the Court relies on the "present" injuries of increased water temperatures and low-level radiation emissions. Even assuming that but for the Act the plant would not exist and therefore neither would its effects on the environment, I cannot believe that it follows that the appellees have standing to attack the constitutionality of the Act. Apart from a "but for" connection in the loosest sense of that concept, there is no relationship at all between the injury alleged for standing purposes and the injury alleged for federal subject-matter jurisdiction.

Surely a plaintiff does not have standing simply because his challenge, if successful, will remove the injury relied on for standing purposes *only* because it will put the defendant out of existence. Surely there must be *some* direct relationship between the plaintiff's federal claim and the injury relied on for standing. Cf. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 261; *United States* v. *SCRAP*, 412 U. S. 669, 687–690; *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617–618. An interest in the local water temperature does not, in short, give these appellees standing to bring a suit under 28 U. S. C. § 1331 (1976 ed.) to challenge the constitutionality of a law limiting liability in an unrelated and as-yet-to-occur major nuclear accident.

For these reasons, I would remand these cases to the District Court with instructions to dismiss the complaint.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEVENS joins, concurring in the judgment.

I can understand the Court's willingness to reach the merits of this case and thereby remove the doubt which has been cast over this important federal statute. In so doing, however, it ignores established limitations on district court jurisdiction

as carefully defined in our statutes and cases. Because I believe the preservation of these limitations is in the long run more important to this Court's jurisprudence than the resolution of any particular case or controversy, however important, I too would reverse the judgment of the District Court, but would do so with instructions to dismiss the complaint for want of jurisdiction. Cf. *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U. S. 246, 249–250 (1951).

Giving the conclusory allegations of appellees' complaint the most liberal possible reading, they purport to establish only two grounds for the declaratory relief requested.. First, they contend that the Price-Anderson Act deprives them of their property without due process of law in that it irrationally limits the tort recovery otherwise available in the North Carolina courts.[1] Second, they contend that the Act works an unconstitutional taking of their property for public use without just compensation. They purport to base District Court jurisdiction upon 28 U. S. C. § 1337 (1976 ed.) which covers "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

## I

It is apparent that appellees' first asserted basis for relief does not state a claim "arising under" the Price-Anderson Act. Their complaint alleges that the operation of the two power plants will cause immediate injury to property within their vicinity. App. 32, ¶ 21. The District Court explicitly found that these injuries "give rise to an immediate right of·action for redress. Under the law of North Carolina a right of action arises as soon as a wrongful act has created 'any injury, how-

---

[1] Appellees have explicitly abandoned their claim based upon the so-called equal protection component of the Fifth Amendment "since in this case any equal protection arguments would be largely duplicative of appellees' due process arguments." Brief for Appellees 21 n. 26.

ever slight,' to the plaintiff." 431 F. Supp. 203, 221 (WDNC 1977) (citations omitted). This right of action provided by state, not federal, law is the property of which the appellees contend the Act deprives them without due process. Thus, the constitutionality of the Act becomes relevant only if the appellant Duke Power Co. were to invoke the Act as a defense to appellees' suit for recovery under their North Carolina right of action.

It has long been established that the mere anticipation of a possible federal defense to a state cause of action is not sufficient to invoke the federal-question jurisdiction of the district courts. In *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149 (1908), the plaintiffs sought to compel the specific performance of a contract by which the railroad had granted them free passes for life. Although their contract was not predicated upon federal law, the plaintiffs contended that federal-question jurisdiction was established by the presence of an Act of Congress forbidding railroads to issue free passes. This Court held that the District Court did not have jurisdiction to consider whether the Act was inapplicable or unconstitutional:

> "It is the settled interpretation of these words ['arising under'], as used in this statute, conferring jurisdiction, that a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution. It is not enough that the plaintiff alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution." *Id.,* at 152.

Just as the underlying claim in *Mottley* arose under Kentucky contract law, the underlying claim in this case arises under North Carolina tort law. This Court has construed the "arising under" language of 28 U. S. C. § 1337 (1976 ed.) just as it has the similar language of 28 U. S. C. § 1331 (1976 ed.). *Peyton* v. *Railway Express Agency, Inc.*, 316 U. S. 350, 353 (1942).

Nor does the fact that appellees seek only declaratory relief under the Declaratory Judgment Act, 28 U. S. C. § 2201 (1976 ed.), support a different result. This Court has held that the well-pleaded complaint rule applied in *Mottley* is fully applicable in cases seeking only declaratory relief, because the Declaratory Judgment Act merely expands the remedies available in the district courts without expanding their jurisdiction. "It would turn into the federal courts a vast current of litigation indubitably arising under State law, in the sense that the right to be vindicated was State-created, if a suit for a declaration of rights could be brought into the federal courts merely because an anticipated defense derived from federal law." *Skelly Oil Co.* v. *Phillips Petroleum Co.*, 339 U. S. 667, 673 (1950). See also *Phillips Petroleum Co.* v. *Texaco Inc.*, 415 U. S. 125 (1974); C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3566, pp. 437–438 (1975).[2]

---

[2] The Court asserts that its decision today does not undermine the well-pleaded complaint doctrine because of its conclusion "that the complaint is more fairly read as stating a claim against the NRC directly under the Due Process Clause of the Fifth Amendment." *Ante*, at 69 n. 13. The supposed claim against the Commission arises only under federal law, since the complaint does not allege and the District Court did not find that North Carolina law would provide any remedy against it as a joint tortfeasor. On the Court's theory of the case, then, it need not decide whether jurisdiction could be obtained over Duke Power under § 1331. *Ante*, at 72 n. 16. That is a particularly felicitous conclusion from the Court's point of view, since the complaint does not allege that each member of the plaintiff class has a claim in excess of $10,000 against Duke Power,

Appellees do not contend that the Price-Anderson Act itself grants to them personal rights which may be vindicated in a federal proceeding. Since the only property rights they assert arise under North Carolina law, the District Court had no jurisdiction to consider whether the setting up of an Act of Congress as a defense against those rights would deny them due process of law under the Fifth Amendment.

Indeed, the Court does not even contend that there is an independent statutory source of jurisdiction over Duke. *Ante,* at 72 n. 16. It suggests instead that the complaint states a claim against the Nuclear Regulatory Commission, not as a joint tortfeasor under North Carolina law, but as the administrator of an unconstitutional federal statute. The Court's theory is that the complaint alleges the existence of an implied right of action under the Fifth Amendment to obtain relief against arbitrary federal statutes. It can hardly be said that this theory of the case emerges with crystal clarity from either the complaint or the brief of the appellees.

More importantly, there is no allegation in this complaint that the Nuclear Regulatory Commission has taken or will take any unconstitutional action at all. The complaint alleges only that the Commission granted construction permits to

which is a prerequisite to jurisdiction under § 1331. *Zahn* v. *International Paper Co.,* 414 U. S. 291 (1973).

Despite the Court's assurances, it is conceivable that the practical effect of today's decision could be an erosion of the well-pleaded complaint doctrine. Had the plaintiffs in *Mottley* joined as defendants a federal agency having as ephemeral a relation to the statute challenged there as does the Commission to the statute involved here, the District Court, according to today's decision, would have had jurisdiction to consider the constitutionality of the statute, even though its judgment would not have been binding against the Louisville & Nashville Railroad. Innumerable federal statutes and regulations affect the daily decisions of private parties, who would undoubtedly appreciate the sort of advisory opinion rendered today on the validity of those provisions. This Court should not encourage the hope that such opinions may be obtained by suing an appropriate federal agency under a claim which verges on the frivolous.

Duke, and that it will enter into an agreement "to indemnify Duke for any nuclear incident exceeding the amount of $125,000,000 subject to a maximum liability of $560,000,000." App. 31, ¶ 13. Neither of these actions is alleged to be unconstitutional. The gist of the complaint is the asserted unconstitutionality of 42 U. S. C. § 2210 (e) (1970 ed., Supp. V), which limits Duke's liability. But this limitation of liability is separate and apart from the indemnity agreement which the Commission is authorized to execute under 42 U. S. C. § 2210 (d) (1970 ed., Supp. V). The Commission has nothing whatever to do with the administration of the limitation of liability; whatever administration of that statute there is to be is left in the hands of the District Court. 42 U. S. C. § 2210 (o) (1970 ed. and Supp. V). The District Court, of course, is not a party to this suit.[3]

It simply cannot be said that these allegations make out an actual controversy against the Commission. While the Commission may be quite interested in the constitutionality of the statute, that is hardly sufficient to establish a justiciable controversy. *Muskrat* v. *United States,* 219 U. S. 346, 361–362 (1911). While appellees may have been damaged by Duke's decision to construct these plants, there is no "challenged action of the defendant" Commission to which their damage "fairly can be traced." *Simon* v. *Eastern Ky. Wel-*

_____

[3] Appellees' challenge to the construction permits was rejected in *Carolina Environmental Study Group* v. *United States,* 166 U. S. App. D. C. 416, 510 F. 2d 796 (1975). It is true, as the Court remarks, *ante,* at 81 n. 26, that "absent the execution of such [indemnity] agreements between the NRC and the licensees, the liability-limitation provisions of the Act, to which appellees object, would simply not come into play." That logical connection, however, does not amount to an allegation that the Commission's execution of an indemnity agreement is itself unconstitutional. The only federal action challenged by this complaint is a hypothetical district court's hypothetical invocation of the statute in the event of a hypothetical nuclear accident. In that entire string of hypothetical events, no action of the Commission is alleged to be unconstitutional.

*fare Rights Org.,* 426 U. S. 26, 41 (1976). If Duke decided to proceed with construction despite a declaration of the statute's unconstitutionality, there would be nothing that the Commission could do to aid appellees. Where the prospect of effective relief against a defendant depends on the actions of a third party, no justiciable controversy exists against that defendant. *Warth* v. *Seldin,* 422 U. S. 490, 505 (1975). In short, appellees' only conceivable controversy is with Duke, over whom the District Court had no jurisdiction.

## II

As appellees themselves describe the second aspect of their complaint, "the central issue is whether in the circumstances of this case, the complete destruction of appellees' property by a nuclear accident, occurring at one of Duke's plants, would be a 'taking' by the United States, as that term is defined in the Fifth Amendment." Brief for Appellees 62. This statement makes clear that appellees' claim arises not under the Price-Anderson Act but under the Fifth Amendment itself. Jurisdiction under § 1337 extends only to actions vindicating rights created by an Act of Congress. Compare *Switchmen* v. *National Mediation Board,* 320 U. S. 297, 300 (1943), with *General Committee* v. *Missouri-Kansas-Texas R. Co.,* 320 U. S. 323, 337 (1943). Since it cannot be maintained that the Price-Anderson Act *created* appellees' asserted right to be free from takings for public use without just compensation, it follows that District Court jurisdiction may not be predicated upon § 1337.

The District Court does have jurisdiction to consider claims of taking under the Tucker Act, 28 U. S. C. § 1346 (a)(2) (1976 ed.), where the amount in controversy does not exceed $10,000.[4] "But the Act has long been construed as authoriz-

---

[4] The Court concludes, *ante,* at 71 n. 15, although appellees do not so contend, that their taking claim is cognizable under 28 U. S. C. § 1331 (a) (1976 ed.), which grants jurisdiction to the district courts where the suit

ing only actions for money judgments and not suits for equitable relief against the United States." *Richardson* v. *Morris,* 409 U. S. 464, 465 (1973). It is incontrovertibly established that neither the Court of Claims nor the district courts have jurisdiction under the Tucker Act to issue the sort of declaratory relief granted here. Compare *ibid.,* with *United States* v. *King,* 395 U. S. 1 (1969). Thus, the record does not establish any jurisdictional basis upon which the District Court could grant declaratory relief on appellees' taking claim.

There being no basis for District Court jurisdiction over either of appellees' claims, its judgment should be reversed and the cause remanded with instructions to dismiss the complaint for want of jurisdiction.

MR. JUSTICE STEVENS, concurring in the judgment.

The string of contingencies that supposedly holds this litigation together is too delicate for me. We are told that but for the Price-Anderson Act there would be no financing of nuclear power plants, no development of those plants by private parties, and hence no present injury to persons such as appellees; we are then asked to remedy an alleged due process viola-

---

"arises under the Constitution." The Court cites only the *Regional Rail Reorganization Act Cases,* 419 U. S. 102 (1974), in support of its conclusion that this claim may be maintained under § 1331. It is, of course, well established that "when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine,* 415 U. S. 528, 535 n. 5 (1974). In the *Regional Rail Reorganization Act Cases* this Court's opinion did not even cite the statutory basis for jurisdiction, much less consider its validity. To conclude that § 1331 embraces a "taking" claim makes the Tucker Act largely superfluous, cf. *United States* v. *Testan,* 424 U. S. 392, 404 (1976), and will permit the district courts to consider claims of over $10,000 which previously could only be litigated in the Court of Claims. *Richardson* v. *Morris,* 409 U. S. 464 (1973). Such a significant expansion of the jurisdiction of the district courts should not be accomplished without the benefit of arguments and briefing.

tion that may possibly occur at some uncertain time in the future, and may possibly injure the appellees in a way that has no significant connection with any present injury. It is remarkable that such a series of speculations is considered sufficient either to make this litigation ripe for decision or to establish appellees' standing;* it is even more remarkable that this occurs in a case in which, as MR. JUSTICE REHNQUIST demonstrates, there is no federal jurisdiction in the first place.

The Court's opinion will serve the national interest in removing doubts concerning the constitutionality of the Price-Anderson Act. I cannot, therefore, criticize the statesmanship of the Court's decision to provide the country with an advisory opinion on an important subject. Nevertheless, my view of the proper function of this Court, or of any other federal court, in the structure of our Government is more limited. We are not statesmen; we are judges. When it is necessary to resolve a constitutional issue in the adjudication of an actual case or controversy, it is our duty to do so. But whenever we are persuaded by reasons of expediency to engage in the business of giving legal advice, we chip away a part of the foundation of our independence and our strength.

I join MR. JUSTICE REHNQUIST's opinion concurring in the judgment.

---

*With respect to whether appellees' claim of present injury is sufficient to establish standing, it should be noted that some sort of financing is essential to almost all projects, public or private. Statutes that facilitate and may be essential to the financing abound—from tax statutes to statutes prohibiting fraudulent securities transactions. One would not assume, however, that mere neighbors have standing to litigate the legality of a utility's financing. Cf. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723.