Edward TUDOR, Robert W. George, Jack Buddy Holt and Earl Henry, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MEMBERS OF the ARKANSAS STATE PARKS, RECREATION AND TRAVEL COMMISSION, Individually and in their official capacities, and the United States of America, Defendants.

Nos. LR–C–79–54, LR–74–C–293.

United States District Court, E. D. Arkansas, W. D.

July 30, 1979.

---

Sam Hugh Park, Van Buren, Ark., for plaintiffs.

Lonnie A. Powers, Sp. Asst. Atty. Gen., Little Rock, Ark., Kenneth Stoll, Asst. U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

In these consolidated cases the plaintiffs, as citizens and taxpayers of the State of

Arkansas, seek to quiet title to land which previously constituted the Buffalo and Lost Valley State Parks. The plaintiffs have premised their claim for relief on the substantive provisions of 28 U.S.C. § 2409a and its jurisdictional counterpart, 28 U.S.C. § 1346(f). The unusual alignment of the parties and the even more unusual relief requested by the plaintiffs are illustrated by the factual background of the cases.

During October, 1973, the Arkansas State Parks, Recreation and Travel Commission held title to approximately 2,300.8 acres of land in Newton and Marion Counties in Arkansas. This land constituted what was then known as the Buffalo State Park and the Lost Valley State Park.[1] Acting pursuant to specific Congressional authorization[2], members of the Arkansas State Parks, Recreation and Travel Commission conveyed to the United States, by quitclaim deed dated October 26, 1973, the land constituting the Buffalo State Park. The Arkansas State Parks, Recreation and Travel Commission, hereinafter referred to as the Commission, had previously conveyed to the United States the land within the Lost Valley State Park. The transfer of the land constituting Lost Valley State Park was effectuated by a special warranty deed executed by the members of the Commission on October 16, 1973.

The plaintiffs in these cases live or own property near what is now the Buffalo National River. They seek, on behalf of themselves and all others similarly situated, to set aside the Commission's conveyance of the two parks on the following grounds: (1) neither the Commission nor its members had authority under the laws or the Constitution of the State of Arkansas to make a "donation"[3] of land owned by the State; (2) the Commission did not give notice of the transfer of the land prior to the conveyance to the United States nor were members of the public afforded an opportunity to be heard on the issue; (3) the transfer of the land was unconscionable and a fraud upon the plaintiffs and others members of the public; (4) the Commission's conveyance of the two parks constitutes an illegal exaction and is, thus, violative of Section 13 of Article 16 of the Arkansas Constitution; and (5) the Commission did not follow procedures established by Arkansas law which govern conveyances of State owned property. In sum and substance, the plaintiffs' complaint challenges the Commission's authority, under Arkansas law, to convey Buffalo State Park and Lost Valley State Park to the United States.

The peculiar posture of these cases is further demonstrated by the relief requested by the plaintiffs. The plaintiffs have not only asked that the conveyances be set aside, but also that the title to the land be resolved in favor of the Arkansas State Parks, Recreation and Travel Commission. The rather strange character of these lawsuits emanates from the plaintiffs' request

1. The natural beauty of the Buffalo State Park and the Lost Valley State Park is a matter of common knowledge within the State of Arkansas. The aesthetic value of these wilderness areas are enhanced by the Buffalo River, a free flowing, scenic river which meanders through the two parks.

2. The Buffalo River became a "national" river by virtue of the enactment of Public Law 92–237, § 1, March 1, 1972, 86 Stat. 44, 16 U.S.C.A. § 460m–8 (1974 ed.). Section 2 of Public Law 92–237, which has been codified as 16 U.S.C.A. § 460m–9, provides in pertinent part:

"Within the boundaries of the Buffalo National River, the Secretary [of the Interior] may acquire lands and waters or interests therein by donation, purchase or exchange, *except that lands owned by the State of Arkansas or a political subdivision thereof may*

*be acquired only by donation*: Provided, That the Secretary may, with funds appropriated for development of the area, reimburse such State for its share of the cost of facilities developed on State park lands if such facilities were developed in a manner approved by the Secretary and if the development of such facilities commenced subsequent to March 1, 1972. Provided further, That such reimbursement shall not exceed a total of $375,000." (Emphasis added)

3. While we find it unnecessary to decide whether the Commission had the authority to convey the land, we do not agree, for reasons which will be stated later, with the plaintiffs' consistent characterization of these conveyances as "donations", insofar as that term might be construed to imply a lack of consideration.

that title be vested in a party defendant, the very same state agency which, if the allegations of the plaintiffs' complaint were established, acted in excess of its authority and in violation of its public trust by conveying the land to the United States in the first instance.

The defendants have challenged the standing of the plaintiffs to litigate the title to the land transferred to the United States. The defendants, particularly the United States, have forcefully argued that the jurisdictional basis of these lawsuits, 28 U.S.C.A. § 2409a,[4] was never intended to provide a federal forum to plaintiffs who have no title, color of title or possessory interest in land in which the United States claims an interest. Alternatively stated, the United States contends that only those parties who have color of title to land in which the United States claims an interest having standing to bring a quiet title action under 28 U.S.C.A. § 2409a. The plaintiffs, on the other hand, have argued that 28 U.S.C.A. § 2409a specifically provides for actions to resolve issues of title when the United States claims an interest, as it does in the present cases, in the land in question. Since, from our review of the files in these cases, the issue of the plaintiffs' standing presents the pivotal question in these lawsuits, we now consider that issue.

## I.

### THE RELATIONSHIP OF STANDING TO CONSTITUTIONAL LIMITATIONS ON THE JURISDICTION ON FEDERAL COURTS

The concept of jurisdiction refers to the power or authority of a court to render decisions which bind the parties before it. Under federal law, the concept of jurisdiction has different elements or parts which deal with various aspects of a proceeding such as the nature or subject matter of the case, the nature of the relief requested, the issues involved and the parties to the lawsuit. It is often said that federal courts are courts of limited jurisdiction. This statement does not refer to the kinds of cases which federal courts are authorized to hear, although that is one aspect of jurisdiction. Federal courts are courts of limited jurisdiction by virtue of the "cases or controversies" requirement set forth in Article III, Section 2, Clause 1 of the United States Constitution.[5] Thus, while Congress may, through specific enactment, extend the kinds of cases a federal court is permitted to hear, that fact alone does not establish federal jurisdiction in a particular case. The "case or controversy" requirement of Article III contemplates more than authority to proceed in cases involving a particular subject matter. As Chief Justice Warren once observed,

" . . . . those two words [case or controversy] have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words 'cases' and 'controversies' are two complimentary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.

4. 28 U.S.C.A. § 2409a(a) provides in relevant portion:

"The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights."

5. Section 2, Clause 1 of Article III of the United States Constitution provides:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a party;—to Controversies between two or more States;—between a State and Citizens of another State; —between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case and controversy doctrine." *Flast v. Cohen,* 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–1950, 20 L.Ed.2d 947 (1968).

■ Standing to sue or litigate exists if a plaintiff is a proper party to request an adjudication of a particular issue. Standing is a vital component or element of the concept of justiciability and, thus, is intimately related to the federal constitutional "case or controversy" doctrine. In regard to constitutional limitations on the jurisdiction of federal courts, the concept of standing has a narrow although important function. As the Supreme Court has observed, "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." [6] Standing to sue is crucial to the very existence of a federal court's jurisdiction since without standing the plaintiff or plaintiffs will not have that personal stake and interest in the outcome of a controversy necessary to give the litigation the concreteness required by Article III. Indeed, unless the plaintiffs having standing to adjudicate a particular issue, there is no "case or controversy" within the meaning of Article III.

## II.

### ANALYSIS OF THE PLAINTIFFS' STANDING

■ Where, as in the present cases, the plaintiffs are relying solely upon a federal statute to confer standing to litigate a particular issue,[7] they must meet a two-fold burden. First, the plaintiffs must allege that they have been injured in fact by the challenged action. Secondly, the plaintiffs' interests must be arguably within the zone of interests protected by the federal statute upon which they are relying. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). We find that the plaintiffs have failed on both counts.

The plaintiffs have alleged in their most recent complaint that they have been injured by the Commission's transfer of the land in Buffalo State Park and Lost Valley State Park in the following respects: (1) their land is being acquired by eminent domain; (2) their businesses are being interrupted; (3) the value of their real estate is being adversely affected; and (4) the character of the communities in which they live is being radically changed. A realistic appraisal of the allegations relevant to the plaintiffs' injuries reveals essentially one injury, acquisition of their lands through eminent domain proceedings. The latter three injuries mentioned above appear to be merely manifestations of the first alleged injury. No other injuries have been alleged or suggested by the plaintiffs. In our view none of the injuries alleged by the plaintiffs satisfy the "injury in fact" standard enunciated by the Court in *Association of Data Processing Service Organizations, Inc.,* and reiterated in *Barlow v. Collins.*

It is undisputed that the plaintiffs have no color of title, right or interest in the land conveyed by the Commission other than that generally enjoyed by citizens of the State of Arkansas. Nor is it disputed that title to the land was vested in the Commission prior to the conveyances to the United States. There is no evidence and there are no allegations which suggest that the land

**6.** 392 U.S. at 101, 88 S.Ct. at 1953.

**7.** We have no occasion to consider whether the plaintiffs have standing to sue as taxpayers inasmuch as Congress' taxing and spending powers are not implicated by the allegations set forth in the plaintiffs' original and amended complaints. The nexus test delineated by the Court in *Flast v. Cohen, supra,* therefore has no application to the cases at bar. *Schlesinger v. Reservists Comm. to Stop the War, supra,* 418 U.S. at 225 n. 15, 94 S.Ct. 2925.

itself has been diminished in value or that public access to the land has been curtailed. Indeed, it seems that the practical significance of the transfer of title to the land within Buffalo State Park and Lost Valley State Park was to confer a substantial benefit on Arkansas taxpayers. It is true that the State, and by implication its taxpayers, may not have realized an immediate cash gain by conveying the land to the federal government. It does not necessarily follow, however, that the State failed to obtain a valuable consideration for the land. Needless to say, the land which formerly constituted Buffalo State Park and Lost Valley State Park is still located within the boundaries of the State of Arkansas and is still available for the public's enjoyment. The difference now is that Arkansas taxpayers do not provide the only revenue base for maintaining and operating the park system along the Buffalo National River. Thus, while the citizens of the State still enjoy the assets of the land, the liabilities of ownership, the costs of maintaining and operating the park system have been significantly reduced by the expansion of the revenue base supporting the park system, a revenue base which includes all federal taxpayers.

■ As a condition precedent to standing to litigate, the plaintiffs must allege that they have sustained some direct, individualized injury. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Abstract or hypothetical injuries and questions which are of a general interest common to all members of the public are not sufficient to confer standing to litigate. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). In addition, there must be a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The connection between the alleged injury and the challenged conduct must be apparent without resort to speculative inferences. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Lastly, and perhaps most importantly, there must be a substantial likelihood that the judicial relief requested by the plaintiffs will prevent or redress the claimed injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

■ With regard to three of the injuries alleged by the plaintiffs, specifically, the interruption of their businesses, adverse effects on the value of their real estate and changes in the character of the communities in which the plaintiffs live, we fail to detect a causal connection between the injuries claimed and the conduct challenged. The plaintiffs have not specified, and we are unable to discern without resort to speculation and conjecture, how the transfer of title to land from one governmental entity to another would produce the results alleged by the plaintiffs. Changes in businesses, real estate values and communities may be caused by a variety of factors, including the mere passage of time. Furthermore, it is extremely tenuous to assign responsibility for the alleged injuries to the change in title of the land in question when, as an undisputed matter of fact, the plaintiffs did not have any title or color of title to the land which was transferred. Indeed, the only connection between the plaintiffs and the State owned property transferred to the United States is that the plaintiffs' property is located near the property which was conveyed. These injuries are obviously too remote and speculative in nature to constitute the detriment contemplated for standing to litigate. *Simon v. Eastern Kentucky Welfare Rights Organization, supra.*

■ The remaining injury alleged by the plaintiffs consists of the acquisition of their property by exercise of the power of eminent domain. This particular injury is one which confronts all property owners, assum-

ing, of course, that a valid or legitimate public use exists for a particular piece of property. More importantly, however, even if this court were to grant the relief requested by the plaintiffs, confirmation of the title to the land in the Arkansas State Parks, Recreation and Travel Commission, that relief would not remove the plaintiffs' property from either the reality or potentiality of condemnation proceedings. The relief requested by the plaintiffs in these cases would, if granted, do no more than effectuate a change in the title to the land from one governmental entity to another. Since both the State and Federal governments have the power to take private property for public use,[8] a power which would be undiminished no matter how the issue of title was ultimately resolved in these cases, the threat of condemnation of the plaintiffs' property would remain even if the plaintiffs obtained the relief sought. Furthermore, we cannot conclude, without engaging in an extraordinary amount of speculation, that the plaintiffs' property would be less likely to be condemned if the State of Arkansas owned the land adjoining or adjacent to the plaintiffs' than if the federal government owned it. The decision to exercise the power of eminent domain is, within the tripartite allocation of powers characteristic of our federal system, committed to a coordinate branch of government. We therefore, in the absence of any evidence or allegation which would illuminate the matter, have no way of knowing if or when the power of eminent domain might be exercised or what factors might tend to influence the decision.

The second prong of the test for determining whether a plaintiff has standing under the Court's decision in *Association of Data Processing Service Organization, Inc. v. Camp, supra,* is whether the plaintiff's interests are arguably within the zone of interests protected by the federal statute upon which reliance is placed. While, in view of the Supreme Court's decision in *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* we seriously question the continued vitality of this particular standard, we consider it prudent to utilize it in the absence of an explicit rejection of the standard.[9]

As we have previously stated, the plaintiffs are relying on the provisions of 28 U.S.C.A. § 2409a as their basis for invoking this court's jurisdiction. Before we can de-

---

**8.** The general authority of federal officials to condemn private land for public uses is expressed in 40 U.S.C.A. § 257 (1969 ed.). The specific authority of the Arkansas State Parks, Recreation and Travel Commission to condemn private land for public use is set forth in Ark. Stat.Ann. § 9–601(1) (Repl.1976).

**9.** Our doubts as to the continued validity of the "zone of interests" test delineated by the Court in *Association of Data Processing Service Organizations, Inc. v. Camp, supra,* are based on two observations. First, the "zone of interests" test has been criticized as an unnecessary, nonconstitutional requirement. See the dissenting opinion of Mr. Justice Brennan in *Barlow v. Collins,* 397 U.S. at 167–170, 90 S.Ct. 832. Secondly, statements by the Court in recent decisions suggest that the "zone of interests" test, if not now repudiated, has undergone reformulization. For example, in the recent decision of *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* the Court stated:

"We continue to be of the same view and cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate anything more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement of Art. III." 438 U.S. at 79, 98 S.Ct. at 2634.

The implications of this statement with regard to the "zone of interests" requirement for standing are not at all clear. It may be that the Court has decided to abandon the "zone of interests" test altogether. On the other hand, the Court may have merely decided to rephrase the "zone of interests" test in order to amplify or clarify its meaning. We suspect that the Court has merely reformulated the zone of interests test in light of the decision in *Simon v. Eastern Kentucky Welfare Rights Organization, supra.* Surely, had the Court intended to reject the zone of interests test entirely, it would have done so by express statement and by limiting the prerequisite for standing to "injury in fact". As a practical matter, however, any ambiguity that may exist is more academic than real from the standpoint of these cases, since we have found that the plaintiffs lack standing under either the standards in the *Association of Data Processing Service Organizations* case or the *Duke Power Company* case.

termine whether the plaintiffs' interests are within the zone of interests protected by this federal statute, we must identify the purpose of § 2409a. Prior to the enactment of the provisions set out in 28 U.S.C.A. § 2409a, the United States could not be made a party defendant to a quiet title action by virtue of the doctrine of sovereign immunity, a doctrine which insulates the United States from suit in the absence of consent to be sued. The effect of this exclusion was to deprive a party litigant of a forum for the resolution of title disputes over land in which the United States claimed an interest unless the United States itself brought suit. Recognizing a need for change in this area.[10] Congress enacted § 3(a) of Public Law 92–562, October 25, 1972, 86 Stat. 1176, a law which is now codified as 28 U.S.C.A. § 2409a. The statute does not confer jurisdiction in quiet title actions. The authority of the district court to hear suits of this nature was established by the provisions of 28 U.S.C.A. § 1346(f). Section 2409a does nothing more than waive sovereign immunity so that a litigant can join the United States as a party defendant in a quiet title action involving land in which the United States claims an interest. The practical result of section 2409a was the creation of a federal forum for the resolution of title disputes between private litigants and the United States.

■ Our assessment of the legislative history of section 2409a and the provisions of 28 U.S.C.A. § 2409a(c) lead us to conclude that the plaintiffs in the cases before the court are not within the class of beneficiaries envisioned by section 2409a. The legislative history of § 2409a convinces us that Congress intended to limit the scope of the waiver of sovereign immunity to those parties who have title or color of title to land in which the United States also claims an interest.[11] Our conclusion in this regard is

**10.** A legislative history of section 2409a, which was being considered as Senate Bill 216, is found in H.R.Rep. No. 92–1559, 92d Cong., 2nd Sess., reprinted in 3 U.S.Code Cong. & Admin. News, pp. 4547–4557, U.S.Code Cong. & Admin.News 1972, p. 4554. Part of the legislative history includes a letter from the Attorney General of the United States to the Speaker of the House of Representatives dated October 6, 1971. The letter summarizes the need for legislative action by stating in pertinent part:

"The bill [S. 216] would allow the United States to be made a party to an action in the Federal district courts to quiet title to lands in which the United States claims an interest.

Suits to quiet title or remove a cloud on title originated in the equity court of England. They were in the nature of bills *quia timet*, which allowed the plaintiff to institute suit when an action would not lie in a court of law. For instance, a plaintiff whose title to land was continually being subjected to litigation in the law courts could bring a suit to quiet title in a court of equity in order to obtain an adjudication on title and relief against further suits. Similarly, one who feared that an outstand[ing] deed or other interest might cause a claim to be presented in the future could maintain a suit to remove a cloud on title. The plaintiff in such suits was required to be in possession, and the usual grounds of equitable jurisdiction (an imminent threat and an inadequate remedy at law) had to be present.

The doctrine of sovereign immunity presently prevents comparable suits from being brought against the United States. Title 28, United States Code, section 2410, allows suits to be maintained when the Government's claim is in the nature of a security interest only. Provision for suits to partition property in which the United States is a joint tenant or a tenant in common is made in 28 U.S.C. sec. 1347. And the Tucker Act, 28 U.S.C. sec. 1346(a)(2), grants the consent of the United States to be used [sued] where the plaintiff alleges that his property has been taken in violation of the Constitution; the plaintiff's remedy however, is just compensation for the taking, not an injunction prohibiting trespass by the United States. These statutes provide for several of the cases where a suit to quiet title would be the appropriate procedure under State law, but it is clear that many situations exist where questions of title to real property cannot be determined at the present time unless the United States itself brings suit."

**11.** Obviously, since the sovereign can refuse to waive its immunity to suit, it can place restrictions or qualifications on those who seek to take advantage of a waiver of immunity. We consider the language of 28 U.S.C.A. § 2409a(c) to be for that specific purpose, to qualify or limit those who can litigate title disputes involving lands in which the United States claims an interest. The legislative history of section 2409a supports this view. In his letter to the Speaker of the House of Representatives, *supra* n. 10, the Attorney General of the United States made the following observations:

buttressed by the wording of 28 U.S.C.A. § 2409a(c):

"*The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.*"

The language in this section would not, in our opinion, have been included in the provisions of section 2409a had Congress not intended to limit the remedy afforded by the statute to those parties who have some color of title to land in which the United States claims an interest. Our determination in this regard is consistent with those courts which have found compliance with § 2409a(c) an essential jurisdictional requirement. See *Buchler v. United States,* 384 F.Supp. 709 (E.D.Cal.1974). In the present cases, it is undisputed that the plaintiffs have no interest in the land conveyed by the Commission to United States other than that which any citizen of the State of Arkansas might have. Such an interest is insufficient to confer standing to litigate issues of title under the provisions of 28 U.S.C.A. § 2409a. We therefore hold that the plaintiffs' interests are not arguably with the zone of interests protected by section 2409a or, alternatively stated, that the plaintiffs are not within the class benefitted by the waiver of sovereign immunity in section 2409a.

For each of the above and foregoing reasons, we hold that the plaintiffs do not have standing to litigate title to the land conveyed by the Arkansas State Parks, Recreation and Travel Commission to the United States in October of 1973.

" * * * * Along with the merger of law and equity, many States have enacted legislation to abolish some of the traditional prerequisites for the institution of suits to quiet title. The requirement of possession has occasionally been dropped (see Cal. CCP sec. 738; Neb. R.R.S.1943 § 25–21,112; and Code Va. § 55–153), and the statutory procedure in some States appears virtually supersede the common law (see Vernon's Ann. Civ.St. Art. 7364, *et seq.*, and 47 Tex.Jur.2d

Quieting Title § 1). Several States allow the plaintiff to obtain a judicial determination of rights acquired by adverse possession in this type of suit, and there is an immense variation with respect to the period of limitation on bringing suits. *It is our belief that uniformity at least as to the plaintiff's qualifications for instituting suit is desirable, and the draft bill sets forth such qualifications.* Possession in the plaintiff is not required. * * " (emphasis added)