A98A2077, A98A2078, A98A2079, A98A2080, A98A2081, A98A2082, A98A2083, A98A2084. INSTITUTE OF NUCLEAR POWER OPERATIONS v. COBB COUNTY BOARD OF TAX ASSESSORS et al. (eight cases).
(510 SE2d 844)

McMURRAY, Presiding Judge.

For the tax years 1993 and 1994, the Institute of Nuclear Power Operations ("INPO" or "Taxpayer") filed a total of eight applications for exemption from tangible property taxes on real and personal property located in Cobb County, Georgia, contending INPO is an institution "of purely public charity." The property at issue consists of business assets such as a computer system, two airplanes, and the multi-story office building used as INPO's headquarters.[1] The Cobb County Board of Tax Assessors and the Board of Equalization ("the Board") denied all applications for an exemption, and INPO appealed to the superior court for a de novo determination. OCGA § 48-5-311

---

[1] INPO leases approximately 25 percent of the floor space to third parties and does not seek exemption for that pro rata portion of its headquarters. See *Church of God &c. v. City of Dalton*, 216 Ga. 659 (119 SE2d 11).

(g) (3). Over INPO's objection, Cobb County and the Cobb County School Board ("Intervenors") were permitted to intervene. On cross-motions for summary judgment, the following undisputed facts were adduced:

After the 1979 nuclear incident at Three Mile Island, "[t]he U. S. nuclear electric utility industry established the [INPO] in 1979 [with the corporate mission] to promote the highest levels of safety and reliability . . . in the operation of . . . nuclear [electric generating] plants, . . ." and thereby promote public health and safety. "All organizations having direct responsibility and legal authority to operate or construct commercial nuclear electric generating plants in the United States are INPO members. Many organizations that jointly own these nuclear power plants are associate members." Conversely, "all INPO members which own Nuclear Power Plants have a commercial license issued by the Nuclear Regulatory Commission [("NRC")]." Specifically, "all members of INPO are investor-owned utilities with the exceptions of the Nebraska Public Power District, New York Power Authority, Omaha Public Power District, Tennessee Valley Authority, and Washington Public Power Supply System." According to Angelina S. Howard, Director of the INPO Communications Division, "all activities of INPO are commercial in the sense that they relate to the commercial generation of electricity." In 1994, the for-profit members of INPO earned a combined net income exceeding $12 billion. According to the 1995 annual report, "INPO's value to the industry lies in its ability to provide utilities with timely performance insights that can be used to improve plant operation and to identify and follow up on initiatives to enhance safety, reliability and efficiency." The 1995 financial statement lists "[m]embers' net assets — unrestricted [at $]24,602,010."

INPO is recognized as a charitable organization exempt from income taxes by both the Internal Revenue Service and the Georgia Department of Revenue. "All of INPO's revenues are used to pay its expenses. It has no retained earnings and pays no dividends to its members." All members of INPO's Board of Directors are high officers employed by INPO members. These directors are not compensated for their services. But INPO's 13 full-time officers are paid salaries competitive with the commercial nuclear electricity industry, ranging from $84,291.82 to a base salary of $390,000 plus a five-year deferred compensation bonus of $454,976.31 for the president and Chief Executive Officer, Zack T. Pate. Total salaries and benefits paid in 1995 amounted to $31,845,998. INPO paid ad valorem taxes on personalty from 1980 through 1992, before it acquired its headquarters.

All members of INPO must pay dues or lose their membership. For 1993, membership dues amounted to more than $50 million. In

addition to annual dues, INPO imposes a requirement whereby "each supplier participant provides INPO with one loaned employee or $6,000 per month for each month a loaned employee is not provided. . . . [INPO] believe[s] the INPO loaned employee program provides a valuable benefit and is a career development opportunity for the industry's nuclear management personnel."

According to the Memorandum of Agreement between INPO and the NRC, INPO is an organization *sponsored* by the nuclear electric utility industry. The NRC "[recognizes] the ability of INPO to contribute to safe and reliable operation with a resulting benefit to public health and safety. . . ." INPO's major activities consist of four cornerstone technical programs: evaluation of member utilities; training and accreditation programs for member utilities; events analysis and information exchange programs for member utilities; and assistance programs, whereby INPO "collects and monitors nuclear plant performance indicator data and provides periodic reports to the industry."

"INPO conducts an evaluation of a nuclear plant by sending a team of engineers and other technical specialists to the plant for two weeks. A team numbers approximately 15 people and includes both INPO personnel and peer evaluators from other nuclear plants. During the two-week evaluation at the plant, the members of the team observe plant personnel carrying out their assigned duties. INPO relies heavily on observations of people at work and on the frank [and confidential] feedback from working-level employees to determine the effectiveness of plant programs and activities. . . ." But because "INPO is not a government organization [it therefore reasons it] has no obligation to provide its reports to the public. The Institute, on behalf of its members, has worked diligently over the years to protect the confidential nature of its evaluation and other plant-specific reports." Consequently, "Plant Evaluation Reports are provided only to the utility . . . responsible for operating the [evaluated] plant. . . ." INPO members who are also members of Nuclear Electric Insurance Limited (NEIL) have authorized and instructed INPO to make available to NEIL at the Institute's office copies of INPO evaluation reports and other data.

INPO's president, Zack T. Pate, publicly acknowledged "there is increasing evidence that the highest levels of safety, reliability, and economic performance go hand in hand. . . . [O]perators of nuclear power plants are required by law, NRC rules and *good business practices* to obtain or provide insurance coverage for their plants. The primary sources of insurance are: (1) commercial insurance pools . . .; (2) nuclear utility insurance pools [such as] NEIL; and (3) additional liability insurance as required by the secondary financial requirements of [federal law]." (Emphasis supplied.) NEIL is an "industry

captive insurance [company]," or a "mutual insurance company . . ." providing government-mandated insurance to "its members against property losses, business interruption coverage and decontamination [and decommissioning] costs resulting from accidental damage." NEIL administers and services its own insurance plans, and INPO "has no involvement with the provision of [such] insurance. . . ." But NEIL reviews INPO reports and data for items that could affect the insurability of its members, and gives member utilities a ten percent property insurance "premium [credit] for INPO Category 1 plants."

"INPO's meeting facilities are intended primarily for INPO-sponsored and INPO-conducted meetings and trainings. . . . Nuclear industry groups may be approved to meet in INPO meeting facilities subject to the following considerations: . . . The meeting will not be open to the public." An INPO airplane is routinely used by the president of INPO for personal use.

The superior court denied INPO's motion for summary judgment and granted that of the Board, concluding that "INPO is not devoted entirely to charitable pursuits, and the use of the property is not exclusively devoted to those charitable pursuits." These eight appeals concerning four tax accounts for two tax years raise identical issues of law based on the same facts, and so the appeals are hereby consolidated for disposition in a single appellate decision. *Held*:

In two related enumerations of error, INPO complains of the grant of the Board's motion for summary judgment and the denial of its own motion, arguing it meets all elements of the appropriate test to be exempt from ad valorem taxes as a purely public charity.

1. "When the tax officer goes forth to search for taxable property, all which he finds employed in the ordinary uses of common life, unless it belongs to the public, he is to regard as taxable." *Trustees &c. of Richmond County v. Bohler*, 80 Ga. 159, 164 (7 SE 633). "Taxation is the rule, and exemption the exception; and, under the [laws] of this state, no property except that specifically mentioned can be exempted from taxation." *The Athens City Water-Works Co. v. Mayor &c. of Athens*, 74 Ga. 413, hn. 1. "The following property shall be exempt from all ad valorem property taxes in this state: . . . [a]ll institutions of purely public charity." OCGA § 48-5-41 (a) (4). "In determining whether property qualifies as an institution of 'purely public charity' as set forth in OCGA § 48-5-41 (a) (4), three factors must be considered and must coexist. First, the owner must be an institution devoted entirely to charitable pursuits; second, the charitable pursuits of the owner must be for the benefit of the public; and third, the use of the property must be exclusively devoted to those charitable pursuits." *York Rite Bodies &c. of Savannah v. Bd. of Equalization of Chatham County*, 261 Ga. 558 (2) (408 SE2d 699).

2. INPO first contends it is an institution devoted entirely to

charitable pursuits, arguing it is a "practical enterprise for the good of humanity" because its mission is excellence and a high degree of safety in the generation of nuclear power, which redounds to the benefit of the environment and the public at large.

" 'A familiar meaning of the word "charity" is almsgiving, but as used in the law it may include "substantially any scheme or effort to better the condition of society or any considerable part of it." [Cit.] " 'Charity,' as used in tax exemption statutes, is not restricted to the relief of the sick or indigent, but extends to other forms of philanthropy or public beneficence, such as practical enterprises for the good of humanity, operated at moderate cost to the beneficiaries, or enterprises operated for the general improvement and happiness of mankind." 61 CJ 455, § 505.' *Sharpe v. Central Ga. Council, B.S.A.*, 185 Ga. 813 (196 SE 762, 116 ALR 373)." *Peachtree on Peachtree Inn v. Camp*, 120 Ga. App. 403, 409 (170 SE2d 709). But of the infinite charities that deserve the plaudits of mankind, our law "restricts tax exemption of institutions of charity to those and those only that are 'purely' charitable and also that are 'public' charity." *United Hosp. Svc. Assn. v. Fulton County*, 216 Ga. 30, 32 (114 SE2d 524).

We do not doubt that INPO's stated mission and successful history of promoting excellence and the highest safety standards within the commercial nuclear power industry benefit all of mankind every day that a nuclear incident is thereby avoided. But such diffuse public benefit is, in our view, inevitably secondary to the immediate pecuniary benefit of INPO's members, predominantly commercial suppliers, and their shareholders, in an industry generating $12 billion in net profits. Pursuant to the Price-Anderson Act, 42 USCS § 2210 et seq., federal law imposes strict liability in tort for a nuclear incident, via a waiver of all legal defenses in exchange for a limitation of liability. See *Duke Power Co. v. Carolina Environmental Study Group*, 438 U. S. 59, 64-65 (98 SC 2620, 57 LE2d 595). Every avoided Chernobyl-like catastrophe also avoids catastrophic strict liability. Preventing power outages benefits members and their shareholders by preventing lost profits. We can discern no eleemosynary element to all of INPO's admirable efforts. While there is undeniable public benefit attending each avoided nuclear catastrophe, it does not result from INPO's philanthropy or public beneficence in operating an enterprise for the good of humanity or for the general improvement and happiness of mankind.

The Taxpayer's reliance on *Chatham County Bd. of Tax Assessors v. Southside Communities Fire Protection*, 217 Ga. App. 361, 364 (457 SE2d 267) is misplaced. There, a non-profit tax-exempt corporation which provided local fire and rescue services under contract to Chatham County through 48 paid employees and 150 volunteers was held entitled to the charitable exemption from ad valorem taxes, where

the evidence showed that "Southside *provided its services to all in need of assistance*, not just to subscribers." (Emphasis supplied.) Id. That element of charitable intent or truly public beneficence (extended during an existing emergency) is sufficient to distinguish that case from the circumstances of INPO as an entity sponsored by a consortium collectively generating $12 billion annual net profits. The superior court in the case sub judice correctly determined that, under the undisputed facts, INPO's efforts are not purely charitable.

3. "The fact that an institution serves a benevolent purpose does not necessarily make it a 'purely public charity.' *United Hospitals Service Assn. v. Fulton County*, 216 Ga. 30, 33[, supra]. No matter how high the ideals of an institution, nor how lofty its purposes, in order for it to qualify as a charitable institution for tax exemption under Code Ann. § 92-201 [now OCGA § 48-5-41 (a) (4)], it must have the sole purpose and activity of dispensing public charity." *Camp v. Fulton County Med. Society*, 219 Ga. 602, 605 (3) (135 SE2d 277). Accord *York Rite*, 261 Ga. 558 (2), 559 (2) (b), supra.

As the president of INPO acknowledges, plant safety and a high degree of reliability go "hand in hand" with economic performance. The same economic factors indicating that INPO's efforts are not purely charitable also indicate that they are not purely public. The primary purpose of INPO is to collect, analyze and disseminate industry lessons learned based on highly confidential surveys. Moreover, there is not a single outside or disinterested director on INPO's Board of Directors. Members must pay dues to belong. See *Ga. Congress of Parents &c. v. Boynton*, 239 Ga. 472, 473 (238 SE2d 113). That portion of the building occupied by INPO is restricted to members and their guests; the public is expressly excluded from industry meetings. The undisputed facts indicate that INPO does not exist for the sole purpose and activity of dispensing purely public charity.

4. Remaining contentions have been considered and are found to be rendered moot by our holdings in Divisions 2 and 3.

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

DECIDED JANUARY 5, 1999 —
RECONSIDERATION DENIED JANUARY 19, 1999 — 

*Alston & Bird, G. Conley Ingram, Timothy J. Peaden, Mary T. Benton, King & Spalding, Frank C. Jones, Robert R. Ambler, Jr.*, for appellant.

*Haynie & Litchfield, Douglas R. Haynie, Brock, Clay, Wilson & Rogers, John C. Borden IV, Richard W. Calhoun, John D. Thalhimer, Dorothy H. Bishop*, for appellees.