OPINION
{¶ 1} Appellant, Howard C. Mangold, appeals his conviction following a jury trial in the Portage County Municipal Court, Ravenna Division, of cruelty to animals. Appellant challenges the credentials of the humane officer and the officer's seizure of his cows. For the reasons that follow, we affirm. *Page 2 
 {¶ 2} On March 9, 2007, appellant was charged with 13 counts of cruelty to animals, misdemeanors of the second degree, in violation of R.C. 959.13(A)(1), each count alleging that he "deprive[d an animal] of necessary sustenance."
 {¶ 3} Subsequently, the state moved to dismiss counts seven through 13, and a jury trial proceeded on counts one through six on November 7, 2007 and November 8, 2007. Prior to trial, appellant discharged the public defender assigned to represent him. At a hearing held on November 6, 2007, appellant agreed to the trial court's appointment of counsel to assist him in his defense as an advisor.
 {¶ 4} Jennifer Sanderson, Humane Officer for the Portage County Animal Protective League ("APL"), testified she has successfully completed the state-required course of study to be a humane officer and is certified by the State of Ohio to hold this position. She has also had experience with livestock and, specifically, in determining whether they are malnourished.
 {¶ 5} Off. Sanderson testified that on January 22, 2007, the APL received a citizen complaint that there were cows on the property located at the corner of Basset and Industry Roads that appeared very thin. Two days later, on January 24, 2007, she went to the property, which is located at 2417 Industry Road in Randolph Township, to observe the cows. She obtained permission from Jack Harvey, the next door neighbor, to walk on his property to observe the cows. Mr. Harvey told her he had not seen anyone care for the cows for some time.
 {¶ 6} On that day it was windy and cold. The temperature was about 20 degrees and there were a few inches of snow on the ground. From Mr. Harvey's property, Off. Sanderson saw eight cows outside a barn located on the property, which, *Page 3 
she said, were too thin. Their back bones and hip bones were too prominent and there were indentations on their backs where muscle or fat should be. There were no doors on the barn and she also saw one or two cows inside.
 {¶ 7} There were no signs of hay or feed in the field for the cows. The only water trough in the field was filled with snow and it did not appear that any fresh water was available to the cows.
 {¶ 8} While at the property, Off. Sanderson spoke with appellant's son David Mangold who lives on the property. He told her that he owns the property, but that the cows belong to appellant who uses the property to keep them.
 {¶ 9} On the following day, January 25, 2007, Off. Sanderson called Dr. Randall Alger, a local veterinarian, and asked him to meet her at the property to observe the cows and give her his opinion about their condition. Later that day Dr. Alger met Off. Sanderson. She spoke with David Mangold again and asked for permission to go on his property with the doctor to observe the cows closer. Mr. Mangold refused and told her she was not allowed on his property. She and Dr. Alger observed the cows from Mr. Harvey's property.
 {¶ 10} Thereafter, Ms. Sanderson spoke to a detective in the Portage County Sheriff's Office about obtaining a search warrant for the Mangold property and cows. They conferred with a judge, who signed a search warrant. On February 2, 2007, Detective Edward Kennedy of the Sheriff's Office executed the warrant with Off. Sanderson and Dr. Alger present. Det. Kennedy went to the house to serve the warrant, but no one answered so he posted it on the door. Two other detectives secured the area. *Page 4 
 {¶ 11} Detective Kennedy climbed the fence, which was around the barn, because there was a padlock on the gate. He, along with Off. Sanderson and Dr. Alger, then went into the barn to observe the conditions in which the cattle were living. They saw a goat chained to a stall with a bucket of frozen water containing only a few grains of corn. There was a metal gravity food dispenser, which was essentially empty and out of reach of the cows. The floor of the barn was completely covered in cow feces, which had been left to accumulate over an extended period. There was no hay on the floor and no water available. There was no dry bedding in the barn for the cows. There was no hay or grain to eat in the stalls.
 {¶ 12} Ms. Sanderson saw some cows that were thinner than the ones she had previously seen in the field. They were in very poor condition. Their coats were matted and their back bones, hip bones, and ribs were protruding. The cows' legs were caked in manure. They had open wounds and hair loss on their backs.
 {¶ 13} The officers found a dead calf in a shed near the barn. They also found a dead calf in the field. Both were very young and frozen solid.
 {¶ 14} Off. Sanderson testified that, in her opinion, appellant's cows had been mistreated or neglected. The detectives removed 11 cows and the two dead calves, and the cows were taken to foster homes.
 {¶ 15} Jack Harvey, David Mangold's next door neighbor, testified he is retired and has lived next door to the property for seven years. He is usually home all day and keeps an eye on the happenings in the area. The APL had recently left a card for him asking him to call. When he called, the APL representative asked him if appellant's cows were being cared for, and he said he had not seen anyone caring for them for two *Page 5 
weeks. Mr. Harvey testified that in that two-week period, appellant's cows were constantly bawling and looked and acted like they needed to be fed.
 {¶ 16} Randall Alger, D.V.M., testified he has been a veterinarian licensed to practice in Ohio since 1984. He has a practice in Mantua, Ohio, and regularly treats horses, cattle, and sheep. From time to time, the APL consults with him regarding the condition and treatment of livestock. He said that on January 25, 2007, Off. Sanderson called and asked him to observe appellant's cattle. When he went out to meet her, it was snowing and the pasture was frozen. From the neighbor's property, he saw a group of cattle outside that were thinner than normal cattle. They had mud and manure stuck on their legs up to their knees. There was no hay, feed, or water available. The water troughs they could see were frozen solid.
 {¶ 17} Dr. Alger testified that veterinarians commonly use a body condition scoring system for cattle, which rates them from one to nine, according to how much body fat they have, with one being emaciated and in danger of dying and nine being fat. All the cows he saw were very thin, with scores ranging from two to four. He gave some of them a score of two, which means they were in poor condition and emaciated. Their ribs, spines, and hip bones were prominent. Their spines were sharp to the touch with only a small amount of tissue covering them. They were very thin and had not had any nutrition recently.
 {¶ 18} One of the young cows he saw standing outside exhibited signs of cold stress from being exposed to the elements and chilled. Some of the cows had hair loss and were rubbing and licking open wounds on their backs and sides due to lice infestation. Dr. Alger testified these cows needed medical treatment. *Page 6 
 {¶ 19} The manure Dr. Alger saw was in dry balls which is not normal in cows. This indicates they are not being given adequate water.
 {¶ 20} Based on his observations, Dr. Alger recommended to the APL that its agents visit the farm to determine if there was food and water available to the cows and dry bedding in the barn. In cold weather cows need a dry place to lie down to keep their coats fluffed in order to keep warm. He further recommended that if there was no food, water, or dry bedding, the APL should provide care to the cattle, and, if they were unable to do so where the cows were being kept, the APL should remove the cattle to another site where care could be given. He said in that weather, if the cows had no water or food, some of them would die from exposure within days.
 {¶ 21} On February 2, 2007, Dr. Alger went to appellant's property and met the sheriff's detectives and Off. Sanderson to execute the search warrant. It was snowy and very cold. The condition of the cattle was the same as when he last saw them, only this time they were all showing signs of cold stress. He said they saw fresh tire tracks from a truck in the snow leading to the barn and about 20 bales of hay that had been brought into the barn.
 {¶ 22} There was room in the barn for about ten cows to lie down, but there was no dry bedding for them. There was no hay in the pens for the cows to eat. They found two dead calves. One was in a shed. It was about two weeks old and had been dead for about one week and was frozen. A second dead calf was found in the pasture. It had been born there within the last few days and was also frozen. The cow that had given birth to this dead calf was spending a lot of time with her calf. *Page 7 
 {¶ 23} Dr. Alger testified they walked through the pasture and there was nothing but mud and feces on the ground. There was no hay under the snow. There was a stream on the property, but he said it would not provide sufficient water to the cattle in freezing temperatures. There were no water troughs with water in them. One water trough in the field was frozen to the point where the cattle could not get water from it, and there was no sign the cattle had tried to get into it.
 {¶ 24} Dr. Alger stated the cattle were not being taken care of properly and were being neglected. The dead calves obviously had not had sufficient care because no one had fed them or brought them into shelter to help them survive. He said that, generally, when people find dead cattle, they remove them immediately. The fact that these dead calves had been allowed to remain untended for an extended period indicated the cattle were not receiving proper care.
 {¶ 25} Dr. Alger testified the dead calves and the adult cows had been deprived of necessary food, water and shelter and had suffered. The adult cows were not being properly cared for and were neglected and some were in danger of dying. Further, he said that if other mother cows were going to calf, those calves would also be at risk of dying due to the conditions he found.
 {¶ 26} As a result of his observations on February 2, 2007, Dr. Alger recommended that these cows be removed to another site where they could receive proper care.
 {¶ 27} Det. Kennedy testified the search warrant allowed the officers to come onto David Mangold's property to evaluate the condition of appellant's cows, and, if it was deemed necessary, to remove the cattle to provide care for them. *Page 8 
 {¶ 28} Det. Kennedy knocked at the door of the house, but no one answered. He then went over the fence and into the barn. He saw fresh tire tracks from that day and some bales of hay had been brought into the barn. While they were executing the search warrant, appellant arrived and admitted the cows belonged to him. Following the search, he and the two other detectives corralled and loaded 11 cows in the trailer and also removed the two dead calves. They left one cow behind that was resisting being led into the trailer for its safety.
 {¶ 29} Appellant testified he lives in a nearby trailer park and went to the property and fed and watered the cows every day. He said he properly cared for his cows. In fact, he said he had been victimized by the officers' "theft" of his property. He testified, "them cows is my savings account. And they — the Humane Society has stolen my savings account. The interest is when they had calves. Just like a bank account. And them cows kept the yard clean. We need them. We had to pay — buy gas to mow the lawn this year because the cows were not there to eat the grass off." Regarding his provision of medical care to the cows, appellant testified, "I have sawed one calf out of a cow. And lost a cow too from paralyzing it."
 {¶ 30} After the presentation of the evidence, the case was submitted to the jury, which returned a guilty verdict as to count one and not guilty verdicts as to the remaining five counts. The court conducted a sentencing hearing on March 21, 2008, during which the court considered appellant's prior conviction for animal cruelty in 1999, which also involved cows. The trial court sentenced appellant to 90 days in jail and imposed a fine of $750. The court suspended the sentence and fine and placed appellant on probation for five years, during which time appellant was ordered not to *Page 9 
own, possess or care for any cows. Pursuant to R.C. 959.13(A), the court also ordered that appellant's cows be sold and that the proceeds be applied, first, to pay for their care from the time they were taken from appellant, with any balance to be paid to him. The court granted a stay of execution of the sentence pending appeal.
 {¶ 31} Appellant lists nine assignments of error and four issues, but fails to provide argument or references to the record under any of them, in violation of App. R. 16(A)(7). That rule provides:
 {¶ 32} "The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."
 {¶ 33} Because appellant failed to present argument or references to the record in support of his assigned errors or his issues on appeal, they are not well taken. Moreover, they are in general vague and difficult to understand, let alone analyze. However, to the extent we are able to make any sense of appellant's claimed errors, we will address them. For his first three assignments of error, appellant asserts:
 {¶ 34} "[1.] There is and was no Habeas Corpus ab initio[.]
 {¶ 35} "[2.] There is and was no Corpus Delecti ab initio[.]
 {¶ 36} "[3.] There is and was no standing in law ab initio[.]"
 {¶ 37} We find no evidentiary support for any of these assigned errors, and we are at a complete loss to understand what appellant is attempting to argue. While these assigned errors may relate to appellant's argument below that the state "violated the law" by failing to number the cows for purposes of identification, by failing to make this *Page 10 
argument in his brief, it is abandoned on appeal. Appellant's first, second and third assignments of error are not well taken.
 {¶ 38} For his fourth assignment of error, appellant asserts:
 {¶ 39} "Jennifer Sanderson acted without proper authority."
 {¶ 40} Appellant does not specify how Off. Sanderson acted without authority. He does not indicate whether he is referring to her authority to investigate, to remove the cows, to testify as an expert, or otherwise. Nor does he make any reference to the record in support of this assigned error to give some indication as to its basis. An assignment of error must state the error claimed with specificity.Industrial Comm. Of Ohio v. Cleek (1920), 13 Ohio App. 417, 423-424. A reviewing court is not required to search the record to find support for the assigned error. Id. An assignment of error must be sufficiently specific that the court of appeals is not required to guess as to the error challenged. Enyart v. Columbus Metro. Area Community ActionOrg. (1996), 115 Ohio App.3d 348, 357. As a result, it is appellant's obligation to state the basis of the claimed error with specificity. As noted supra, he does not explain how Off. Sanderson lacked authority. This court will not speculate as to the basis of this assigned error.
 {¶ 41} In any event, we note that Off. Sanderson testified that she successfully completed the state-required course of study to become a humane officer in 2006, and that she is certified to be a humane officer by the State of Ohio. She also testified concerning her experience with livestock and, specifically, in determining whether cattle are malnourished. Moreover, appellant failed to present any evidence that she is not authorized to perform any of the actions concerning which she testified or that she is not qualified to testify as an expert. While appellant attempted to discredit Off. Sanderson *Page 11 
on cross examination by having her admit she did not have a "license for large animals," the uncontradicted evidence is that there is no such requirement to be a humane officer. In any event, this was an issue that went to the weight of the witness' testimony, rather than its admissibility. The credibility of the witnesses is the province of the jury. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's fourth assignment of error is not well taken.
 {¶ 42} For appellant's fifth assigned error, he contends:
 {¶ 43} "Jennifer Sanderson did not attempt to speak in any instance or time with [appellant] about the assumed issues that seemed to be present."
 {¶ 44} Appellant does not refer to the record and cites no authority which would require Off. Sanderson to attempt to speak to him about the issues in the case. In any event, based on our own research, there is no authority which would require such discussion before an investigating officer is permitted to investigate criminal conduct.
 {¶ 45} To the extent appellant is suggesting that the humane officer should have discussed the matter with him before she obtained a search warrant, first, we note there is no such legal duty. Next, we note that Off. Sanderson spoke to appellant's son David Mangold, the landowner, twice during her investigation. On January 25, 2007, when she asked David Mangold for permission to walk onto his property with Dr. Alger to more closely observe the condition of the cows, he denied her that permission and told her she was not allowed to come on his property. As a result, she had no alternative but to obtain a search warrant. Appellant's fifth assignment of error is not well taken.
 {¶ 46} For his sixth assigned error, appellant alleges:
 {¶ 47} "Jennifer Sanderson acted with malice against Howard Mangold." *Page 12 
 {¶ 48} First, we note appellant never made this argument below. As a result, it is waived on appeal. State v. Awan (1986), 22 Ohio St.3d 120,122. "`[A]n appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" Id. at 122, quoting, State v. Childs (1968), 14 Ohio St.2d 56.
 {¶ 49} Next, appellant does not refer to the record to support this argument. In any event, based upon our thorough and complete review of the record below, there is no evidence that would support appellant's assignment of error alleging malice on the part of Off. Sanderson.
 {¶ 50} Finally, malice of an investigating officer is not a defense in a criminal case. As a result, whether the humane officer had malice is irrelevant to the charge of which appellant was convicted. To the extent that appellant is arguing that the investigator was biased against him, this is a matter of credibility which, as noted supra, is the province of the jury. DeHass, supra. Appellant's sixth assigned error is not well taken.
 {¶ 51} Next, for appellant's seventh assignment of error, he claims:
 {¶ 52} "Jennifer Sanderson conspired with others to defame and disparage [appellant]."
 {¶ 53} Again, appellant never made this argument below and it is waived on appeal. Awan, supra. Next, there is no evidence of a conspiracy to defame appellant in the record. Finally, conspiracy to defame is not a defense to cruelty to animals, so that even if there was evidence to support such allegation, it would not constitute a defense *Page 13 
and would be irrelevant to the charge. Appellant's seventh assigned error is not well taken.
 {¶ 54} Appellant's eighth and ninth assignments of error are interrelated and shall be considered together. They assert:
 {¶ 55} "[8.] Jennifer Sanderson applied her own form of justice against [appellant] and his son David.
 {¶ 56} "[9.] Jennifer Sanderson worked with others, not only from her office, but through the sheriff's department to make sure that [appellant's] cows would be held for ransom by [appellant's] lack of expertise and monies available to fight the system."
 {¶ 57} Appellant never raised these issues below and they are therefore waived on appeal. In any event, these assigned errors are not supported by the record and are not legally cognizable. To claim that an investigator applied his or her own form of justice does not form the basis of any defense or error. As to his ninth assigned error, appellant does not refer to the record and we find no evidence in the record for his contention on appeal that Off. Sanderson attempted to have appellant's cows held for ransom. Again, even if there was such evidence, it would be irrelevant as kidnapping on the part of law enforcement is not a defense to animal cruelty. Appellant's eighth and ninth assignments of error are not well taken.
 {¶ 58} Appellant also asserts four issues, which, while not denominated as assignments of error, are essentially presented as such. His first and third issues are interrelated and shall be considered together. For these issues, appellant asserts: *Page 14 
 {¶ 59} "[1.] Immediate Trespass without proper Identification[.][sic] The parties known as Jennifer Sanderson, Detective Edward Kennedy, and their helpers willfully trespassed on David Mangolds' [sic] property without proper documents, etc.
 {¶ 60} "[3.] The theft of personal property belonging to Howard Mangold. A [sic] Jennifer Sanderson, Detective Edward Kennedy, and their helpers did willfully chase, abuse, damage, cause [sic] to load the cows into a trailer for transport from the property."
 {¶ 61} Under these issues, appellant argues the investigating officers trespassed onto his son's land and stole his property. However, the record demonstrates that, prior to going onto the property of appellant's son and seizing appellant's property, the officers obtained a search warrant. If appellant wished to challenge that warrant, he was required to file a motion to suppress. Crim. R. 12(C) provides:
 {¶ 62} "Prior to trial, any party may raise by motion any defense, objection, evidentiary issue, or request that is capable of determination without the trial of the general issue. The following must be raised before trial:
 {¶ 63} "* * *
 {¶ 64} "(3) Motions to suppress evidence * * * on the ground that it was illegally obtained. Such motions shall be filed in the trial court only."
 {¶ 65} Since appellant failed to file a motion to suppress challenging the validity of the search warrant, any issue arising from the officers' entry onto his son's real property and the seizure of his cows is waived for purposes of appeal. Even if the issues were not waived, they would not be well taken because the search warrant *Page 15 
authorized the officers' entry onto the property and the seizure of appellant's cows. Appellant's first and third issues are not well taken.
 {¶ 66} Finally, appellant's second and fourth issues are interrelated and shall be considered together. For these issues, appellant contends:
 {¶ 67} "[2.] Willful physical damage to private property without provocation. These same parties, and their helpers did willfully physically [sic] damage property (fences, gates, wiring etc.,[)] belonging to David Mangold.
 {¶ 68} "[4.] Willful damage, and cruelty to the cattle belonging to Howard Mangold. A [sic] Jennifer Sanderson, Detective Edward Kennedy, and their helpers did willfully cause the animals to get excited to the point that they did not react to any commands in that they fell over themselves and the violators in trying to get out of the way of the violators."
 {¶ 69} First, we note that appellant does not have standing to assert the officers damaged his son's real property during their search and seizure of appellant's cows.
 {¶ 70} The essence of the standing inquiry is whether the party seeking to invoke the court's jurisdiction has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions.Duke Power Co. v. Carolina Environmental Study Group (1978),438 U.S. 59, 72, citing Baker v. Carr (1962), 369 U.S. 186, 204. This requirement of a personal stake must consist of a distinct and palpable injury to the plaintiff, Duke Power Co., supra, citing Warth v. Seldin (1975),422 U.S. 490, 501, and a fairly traceable causal connection *Page 16 
between the claimed injury and the challenged conduct. Duke PowerCo., supra, citing Arlington Heights v. Metropolitan Housing Dev.Corp. (1977), 429 U.S. 252, 261.
 {¶ 71} Appellant does not even attempt to argue on appeal that he was injured as a result of the alleged damage to his son's real property. As a result, appellant does not have standing to assert his second issue. However, even if he did have standing, this issue would not provide a defense because whether the officers damaged his son's real property was irrelevant to whether appellant was guilty of animal cruelty.
 {¶ 72} As to appellant's fourth issue, there is no evidence the cows were willfully injured in the loading process. Det. Kennedy testified that after they loaded 11 live cows, one cow refused to cooperate. After Det. Kennedy was run down by it a few times, the detectives cornered the cow in the barn and tried to escort it out to the trailer with a rope. It got away from the detectives and knocked them down. They were unable to catch it and, because they felt the cow was going into distress by trying to run away from them, they decided it was safer for the cow to leave it. Further, Dr. Alger testified it was difficult loading the cattle because appellant did not have facilities or gates to assist in the process. Dr. Alger said that they had to round up the cattle to load them, and that they had to use a stick to help convince the cows to go into the trailer, but that is not uncommon and there was no excessive force used to load the cows.
 {¶ 73} Further, while appellant suggested in his brief that the two calves were trampled to death and some cows were bruised in the loading process, there is no evidence in the record to support this argument. We note that even if there was a conflict in the evidence on this issue, it would have been up to the jury to decide whose *Page 17 
testimony was more credible. DeHass, supra. In finding appellant guilty, the jury obviously found the officers' testimony credible.
 {¶ 74} As a result, appellant's second and fourth issues are not well taken.
 {¶ 75} For the reasons stated in the Opinion of this court, the assignments of error are without merit, and it is the judgment and order of this court that the judgment of the Portage County Municipal Court, Ravenna Division, is affirmed.
MARY JANE TRAPP, J., concurs, COLLEEN MARY O'TOOLE, J., concurs in judgment only with Concurring Opinion.